**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

MICHAEL CHARLES VINYARD,
          *Defendant-Appellant.*

No. 00-4442

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CR-99-429)

Argued: May 8, 2001

Decided: September 11, 2001

Before NIEMEYER, WILLIAMS, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in
which Judge Niemeyer and Judge Williams joined.

## COUNSEL

**ARGUED:** Robert Eugene Breckenridge, II, JOHNSON, HESTER,
WALTER & BRECKENRIDGE, L.L.P., Ottumwa, Iowa, for Appel-
lant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** J. Rene
Josey, United States Attorney, Alfred W. Bethea, Jr., Assistant United
States Attorney, District of South Carolina, for Appellee.

## OPINION

KING, Circuit Judge:

Michael Vinyard was convicted by a jury in the District of South Carolina of fourteen counts of mail fraud and twelve counts of money laundering. He was sentenced to seventy months imprisonment, followed by three years of supervised release, and ordered to pay restitution in a sum exceeding $1.4 million. In his appeal, Vinyard challenges the validity of his convictions and sentence. For the reasons explained below, we affirm.

I.

Michael Vinyard ("Michael"), a practicing attorney in Iowa, was invited by his brother, James Vinyard ("James"), in the fall of 1990, to enter into a joint business venture. At that time, James was employed in South Carolina by the Sonoco Products Corporation ("Sonoco"). Sonoco's high density film products division, which manufactures plastic grocery bags, had decided to explore opportunities to use recycled materials, and had installed James as Recycling Manager. Believing that it would be most efficient to handle Sonoco's recycling efforts internally, James actively campaigned to form a new recycling division within the company, which he proposed to head. Sonoco, however, did not want the industry or consumers to know that it was using scrap or recycled materials, and instead it directed James to employ an independent broker to research potential sources of recycled resins and to negotiate deals for Sonoco on a confidential basis. Rather than locate such a broker, James devised a more personally lucrative solution: the creation of his own brokerage. James enlisted the services of his brother, Michael, and together they created the entity Charles Stewart Enterprises ("CSE"). CSE was incorporated in the State of Iowa, with the incorporation documents naming Michael's law partner as the incorporator and President.

James took charge of CSE's operations from its inception, while administrative matters were relegated to Michael. Michael's responsibilities consisted chiefly of providing CSE with office space in his law firm, arranging the installation of separate phone and fax lines,

and retaining secretarial and accounting services.[1] Under James's direction, CSE presented itself to Sonoco and plastic vendors as an independent broker; it purchased recycled resins from various vendors and sold them to Sonoco, collecting a commission on each sale. Sonoco was led to believe that Charles Stewart was an actual person at CSE and also that CSE was a legitimate broker of recycled plastic pellets that could provide such pellets at the lowest possible price. In addition to its brokering operations, CSE became involved in the enterprise of collecting used grocery bags from Sonoco customers and selling them for an unlawful commission (i.e., a kickback) to companies that would reuse or recycle them. Between 1991 and 1997, Sonoco paid CSE over $12 million, yielding the brokerage a net profit of more than $2.8 million.

In carrying out the fraud scheme, James consistently misrepresented the relationship between CSE and Sonoco. He advised outside vendors that CSE had been established to protect Sonoco's confidentiality, with Sonoco's full knowledge. Similarly, CSE employees Brenda Westvold and Martha Harrison were told that Sonoco was aware of James's involvement in CSE, but they were warned not to disclose the Vinyard name to others. Both James and Michael funneled their CSE earnings through another entity, Birchwood Enterprises, so that there would be no mention of CSE on their income tax returns.

In April 1997, a disgruntled CSE client informed Sonoco of James's practice of exacting unlawful commissions in the resale of used Sonoco bags. An investigation followed, leading to the discovery of James and Michael's CSE operation and the issuance, on May 15, 1999, of an indictment charging Michael Vinyard with multiple counts of mail fraud and money laundering.[2] More specifically, the

---

[1]Initially, CSE's clerical work was performed by secretaries in Michael's law office. This arrangement proved awkward, however, and Michael fired one of the secretaries, Beverly Wells, after she objected to working on CSE matters. Eventually Michael hired office managers to handle CSE's administrative/accounting tasks, such as preparing invoices, receiving payments for materials, paying suppliers, and preparing CSE's tax returns.

[2]Michael Vinyard was indicted for mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346, as well as § 2 (aiding and abetting). Under the

indictment charged that Michael "knowingly and willfully did devise and intend to devise a scheme and artifice to defraud Sonoco . . . out of (1) the intangible right of honest services of its employee, James Stewart Vinyard, and (2) out of money and property[.]" J.A. 14. The indictment also alleged that Michael had established CSE in cooperation with James, and that they had utilized CSE to overcharge Sonoco for recycled plastic pellets, "keeping the amount of the 'mark up' for themselves." J.A. 15. Additionally, the indictment alleged that Michael and James caused Sonoco to pay substantial fees to them in connection with its grocery bag collection program, even though James bore a preexisting duty to handle the recycling program in his capacity as a Sonoco employee.

In response to the threat of prosecution for mail fraud and money laundering, James pleaded guilty, cooperated with the Government, and testified against Michael. Following a jury trial in August 1999, Michael was convicted of fourteen counts of mail fraud and twelve counts of money laundering. Michael was sentenced to seventy

---

primary mail fraud statute, 18 U.S.C. § 1341 (2000):

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined . . . or imprisoned . . . or both.

The provisions of § 1341 are modified and supplemented by the honest services doctrine, codified in 18 U.S.C. § 1346 (2000), in the following manner:

> [T]he term "scheme or artifice to defraud" [in chapter 18] includes a scheme or artifice to deprive another of the intangible right of honest services.

Michael was also indicted for money laundering, that is, for knowingly conducting financial transactions "designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, or the control of the proceeds" of the fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and § 2.

months imprisonment, ordered to pay $1,418,419.65 in restitution, and directed to serve three years of supervised release. He timely filed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Michael Vinyard assigns multiple errors to the proceedings in the district court. First, and most fundamentally, he challenges the applicability of the federal mail fraud statute to his case. Michael asserts that his conduct cannot violate 18 U.S.C. §§ 1341 and 1346, because he neither intended to cause economic harm, nor caused actual economic harm, to Sonoco. Although Michael contends that he is challenging the district court's denial of his motion to dismiss the mail fraud charges, his argument more substantively constitutes a challenge to the denial of his motion for judgment of acquittal. *See* Fed. R. Crim. P. 29. In any event, the specific ruling he is contesting is not controlling, because we would affirm the district court in both situations.

We review challenges to the sufficiency of an indictment de novo, and we review the denial of a motion for judgment of acquittal for whether, when viewed most favorably to the Government, there is sufficient evidence to sustain a conviction on the charge in question. *United States v. Butler*, 211 F.3d 826, 829 (4th Cir. 2000); *United States v. Darby*, 37 F.3d 1059, 1062 (4th Cir. 1994); *see also United States v. Glasser*, 315 U.S. 60, 80 (1942) ("It is not for us to weigh the evidence or determine the credibility of witnesses. The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.").

Second, Michael asserts that he was denied a fair trial because of prosecutorial misconduct. Specifically, he posits that the prosecution suppressed material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that the prosecution made use of evidence at trial that the prosecutor had agreed would not be presented.[3]

---

[3]Although Michael characterizes these claims as prosecutorial misconduct, Government misconduct is not necessary for a *Brady* violation. As we noted in *Spicer v. Roxbury Correctional Institute*, inadvertent failures by the state to turn over material evidence favorable to the defendant can also be the basis of a *Brady* claim. 194 F.3d 547, 555 (4th Cir. 1999).

Because Michael failed to raise either of these issues in the district court, we review these contentions for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Fisher*, 58 F.3d 96, 100 (4th Cir. 1995). To meet the standard of review for plain error, Michael must demonstrate to us that there was (1) an error, (2) that it was plain, and (3) that it affected substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993)(construing the requirements of Fed. R. Crim. P. 52(b)). Furthermore, the correction of plain error lies within the discretion of this Court, and is not to be exercised "unless the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

Third, Michael contends that his sentence violated the Sentencing Guidelines because the district court misapplied the Guidelines' loss enhancement provisions. When addressing an application of the Guidelines, we review the district court's "factual findings for clear error and legal interpretations de novo." *United States v. Colton*, 231 F.3d 890, 911 (4th Cir. 2000).

Fourth, Michael contests the validity of the district court's order of restitution. Although he does not challenge the magnitude of the restitution award, Michael asserts that the payment schedule developed by the court did not properly consider his financial status and prospects as required by the Mandatory Victims Restitution Act of 1996 (MVRA). We review a district court's order on restitution for an abuse of discretion. *United States v. Henoud*, 81 F.3d 484, 487 (4th Cir. 1996).

Fifth, Michael contends that he was denied a fair trial due to ineffective assistance being rendered by his counsel. Such claims are reviewed on direct appeal "if and only if it conclusively appears from the record that his attorney did not provide effective assistance." *United States v. Martinez*, 136 F.3d 972, 979 (4th Cir. 1998); *United States v. Smith*, 62 F.3d 641, 651 (4th Cir. 1995). Ineffective counsel claims receive de novo review, and they may result in relief for the defendant only if (1) the errors made by defense counsel were so serious that the representation fell below objective standards of reasonableness, and (2) defense counsel's performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

We address these claims of error in turn.

### III.

### A.

### 1.

Michael contends that his indictment was invalid with respect to the mail fraud charges because the Government failed to allege and prove the elements required for a deprivation of honest services under §§ 1341 and 1346. More specifically, Michael asserts that actual economic harm to the employer is a necessary element of this crime in the private employment context, and that the Government failed to demonstrate that Sonoco had suffered actual economic harm as a result of Michael and James's fraudulent conduct.

Michael's assertion on this point misapprehends the requirements for an indictment. A valid indictment must "contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992); *see also* Fed. R. Crim. P. 7(c)(1). In addition, we have held that "[e]very essential element of an offense must be charged in the body of an indictment, and the inclusion of a reference to the statute will not cure the failure to do so." *Daniels*, 973 F.2d at 274. The sufficiency of an indictment turns on whether the grand jury has found and alleged all the elements of the offense charged as required by the "Fifth Amendment guarantee that no person be held to answer for an infamous crime unless on indictment of a grand jury." *Id.* (quoting *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988)). A mere statutory citation in the indictment is insufficient precisely because it does not demonstrate whether that Fifth Amendment mandate has been followed. *Id.*

The mail fraud statute makes it criminal to devise or intend to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341 (2000). We have observed that the ele-

ments of mail fraud are "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purposes of executing the scheme." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1404 (4th Cir. 1993) (quoting *United States v. Murr*, 681 F.2d 246, 248 (4th Cir. 1982)). In codifying the "honest services" doctrine in 1988, as embodied in 18 U.S.C. § 1346 (2000), Congress made it clear that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."[4] Thus, the elements of a mail fraud scheme involving the deprivation of honest services are identical to those of a normal mail fraud prosecution. Although judicial interpretation of the "honest services" doctrine has somewhat limited its scope in the private employment context, *see infra* Part III.A.2.a., those limitations have not altered the essential elements of the mail fraud offense that must be alleged in the indictment. Michael's indictment alleged that (1) Michael and James had developed a scheme to defraud Sonoco by overcharging it for plastic pellets and by setting up a sham brokerage to pocket commissions on the recycling program, and (2) that Michael and James had used the mails in the furtherance of that scheme. This indictment therefore complied with the statutory and constitutional requirements, and the district court's denial of Michael's motion to dismiss was entirely proper.

2.

a.

To the extent that Michael contends that the district court's denial of his motion for judgment of acquittal was error, we are similarly unpersuaded. Although the honest services theory of mail fraud is

---

[4]Prior to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), the mail fraud statute had been consistently interpreted to include fraud involving the deprivation of honest services. In *McNally*, however, the Court held that schemes to deprive citizens of their rights to honest government did not fall within the scope of the mail fraud statute. *McNally*, 483 U.S. at 358-61. Congress thereafter enacted § 1346 to "restore the mail fraud statute to its pre-*McNally* position by allowing mail fraud convictions to be predicated on deprivations of honest services." *United States v. Gray*, 96 F.3d 769, 774 n.8 (5th Cir. 1996).

directed primarily at the deterrence and punishment of corruption among public officials, the courts have consistently recognized the statute's province to encompass dishonest acts perpetrated in private commercial settings. *See United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000) (reviewing the evolution and application of the mail fraud statute). This recognition of liability within the private sector comprehends that a corporate officer or other private employee may bear a duty of loyalty to his employer, just as a public official owes the citizenry a duty to govern honestly and impartially.

As Michael recognizes, the scope of criminal liability deriving from employer-employee relationships lacks precise definition. The plain language of the "honest services" doctrine codified in § 1346 suggests that "dishonesty by an employee, standing alone, is a crime." *United States v. Frost*, 125 F.3d 346, 368 (6th Cir. 1997). Under such an application of the statute, Michael's conduct is clearly within the scope of § 1346. This construction, however, potentially extends criminal liability to a broad range of employment contexts, and courts generally have been reluctant to apply § 1346 in a way that would expose employees to mail fraud prosecution for "every breach of contract or every misstatement made in the course of dealing." *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997). Therefore, courts construing and applying § 1346 have consistently utilized certain principles to limit its scope in the private employment context. *See, e.g.*, *Martin*, 228 F.3d at 17 (merely examining confidential information for employee's own purposes in breach of fiduciary duty is insufficient for § 1346 liability, but using confidential information for employee's own purposes in a way that harms tangible employer interests is sufficient); *United States v. deVegter*, 198 F.3d 1324, 1328-29 (11th Cir. 1999) ("[T]he breach of loyalty by a private sector defendant must in each case contravene — by inherently harming — the purpose of the parties' relationship."); *United States v. Pennington*, 168 F.3d 1060, 1065 (8th Cir. 1998) ("[T]o be guilty of mail fraud, defendants must also cause or intend to cause actual harm or injury, and in most business contexts, that means financial or economic harm."); *United States v. Sun-Diamond Growers of California*, 138 F.3d 961, 973 (D.C. Cir. 1998) ("[T]here must be a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer.") (quoting *United States v. Lemire*, 720 F.2d 1327, 1337 (D.C. Cir.

1983)); *Frost*, 125 F.3d at 369 ("[T]he prosecution must prove . . . that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim."); *Cochran*, 109 F.3d at 667 ("We [acknowledge] . . . that § 1346 must be read against a backdrop of the mail and wire fraud statutes, thereby requiring fraudulent intent and a showing of materiality."); *United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996)("[A] breach of fiduciary duty can constitute illegal fraud . . . only when there is some detriment to the employer.") (quoting *United States v. Ballard*, 663 F.2d 534, 540 (5th Cir. 1981)).

We have not heretofore addressed the reach of the honest services doctrine in the private employment context; our sister circuits, however, have split over the proper approach. On the one hand, several circuits have held that the Government "must prove that the employee intended to breach a fiduciary duty, and that the employee foresaw or reasonably should have foreseen that his employer might suffer an economic harm as a result of the breach." (the "'reasonably foreseeable harm' test"). *Frost*, 125 F.3d at 368; *see also Martin*, 228 F.3d at 17; *deVegter*, 198 F.3d at 1328-30; *Sun-Diamond Growers*, 138 F.3d at 973-74; *Lemire*, 720 F.2d at 1337 ("The crucial determination must be whether [a] jury could infer that the defendant might have reasonably contemplated some concrete business harm to his employer stemming from his failure to disclose the conflict along with any other information relevant to the transaction."). On the other hand, some circuits have construed the honest services doctrine merely to require a showing that the employee possessed a fraudulent intent and that the misrepresentation at issue was material. (the "materiality test"). *Cochran*, 109 F.3d at 667; *see also Pennington*, 168 F.3d at 1065; *Gray*, 96 F.3d at 774-75.[5] Courts that prefer the materiality test have defined materiality as "any misrepresentation that has

---

[5]The Second and Eighth Circuits have also held that an employee does not need to breach a fiduciary duty to his employer to violate § 1346. *See United States v. Ervasti*, 201 F.3d 1029, 1036 (8th Cir. 2000); *United States v. Sancho*, 157 F.3d 918, 920 (2d Cir. 1998). In this case, however, construing the evidence in the light most favorable to the Government, James breached his fiduciary duty to Sonoco. Therefore we need not reach the issue of whether a breach of fiduciary duty is necessary for a successful § 1346 prosecution.

the natural tendency to influence or is capable of influencing" the employer to change his behavior. *Cochran*, 109 F.3d at 667-68 n.3; *see also Gray*, 96 F.3d at 775 ("Materiality exists whenever 'an employee has reason to believe that the information would lead a reasonable employer to change its business conduct.'") (quoting *United States v. Ballard*, 663 F.2d 534, 540 (5th Cir. 1981)).[6]

The two tests (the reasonably foreseeable harm test and the materiality test) are similar in many respects. We are persuaded, however, that the reasonably foreseeable harm test, as adopted and explained by the Sixth Circuit in its *Frost* decision, is the better approach. We reach this conclusion for two important reasons.[7]

First, the reasonably foreseeable harm test keeps the focus of the analysis on employee intent rather than on employer response. As we have noted, courts have generally viewed the honest services doctrine as not encompassing all breaches of legal duties in the private employment context; they have instead limited its application to particularly significant breaches of such duties. The central question, therefore, is whether the severity of the employee's fraudulent conduct is sufficient to prove a deprivation of honest services. While an employer may overreact to an insignificant fraud or underreact to a significant one, the employer's response should not affect whether the employee can be prosecuted under § 1346. By framing the test in terms of whether the employee met the threshold level of intent, the

---

[6]The issue of which test constitutes the proper approach was not briefed or argued by the parties, nor addressed by the district court. However, the scope of the honest services doctrine was raised both at trial and on appeal by Michael, and his challenge to the denial of judgment of acquittal requires us to examine whether sufficient evidence was presented to support the verdict under the requirements of § 1346. Accordingly, our review of the judgment of conviction requires that we address the proper construction of the honest services doctrine in the private employment context.

[7]For the most part, application of the materiality approach will be identical to the reasonably foreseeable harm test, because an employer would almost certainly alter his business practices if disclosure of a fraud scheme revealed either foregone business opportunities or an economic threat. *Frost*, 125 F.3d at 369.

*Frost* approach keeps the focus of the § 1346 charge on the fraud, not the employer response. *Frost*, 125 F.3d at 368 ("The standard we adopt for this circuit properly focuses on the intent of the employee.").

Second, in a similar vein, the reasonably foreseeable harm test is also superior to the materiality test because it does not extend § 1346 liability to circumstances in which employers change their business practices to avoid the mere appearance of impropriety. *See id.* at 369 (contending that appearance of impropriety may provoke change even though fraud in question never constituted economic threat). Because even trivial frauds might provoke a change in business practices, bringing such a situation within the scope of § 1346 would potentially criminalize any breach of a duty of loyalty in the private employment context. *See id.* Therefore, because it both keeps the focus on employee intent and because it limits the scope of § 1346 to serious harms, we prefer the *Frost* standard, i.e., the reasonably foreseeable harm test.

b.

We next turn to the question of whether the reasonably foreseeable harm test requires proof of actual economic harm in order to establish criminal liability. In this regard, Michael contends on appeal that his indictment for mail fraud should have been dismissed because Sonoco suffered no economic harm as a result of the alleged self-dealing. In the context of private business relationships, Michael asserts, the honest services theory of mail fraud requires either an intent to cause pecuniary harm to the victim or actual pecuniary harm to the victim; self-dealing alone, according to Michael, does not satisfy the requirements of § 1346. Michael insists that the transactions between Sonoco and CSE were fair, even beneficial, to both parties, and therefore asserts that the economic loss requirement of § 1346 has not been met.

Michael's contention on this point reveals a misunderstanding of § 1346. The reasonably foreseeable harm test neither requires an actual economic loss nor an intent to economically harm the employer. *See Sun-Diamond Growers*, 138 F.3d at 974 ("Sun-Diamond appears to confuse the requirement of an intent to defraud

. . . with a requirement of intent to cause economic harm."). Under this test, the employee need only intend to breach his fiduciary duty and reasonably foresee that the breach would create "an identifiable economic risk" for the employer. *Frost*, 125 F.3d at 369; *see also Martin*, 228 F.3d at 17; *Sun-Diamond Growers*, 138 F.3d at 973; *Lemire*, 720 F.2d at 1337 ("There must be a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer."). Thus, the reasonably foreseeable harm test is met whenever, at the time of the fraud scheme, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being. Furthermore, the concept of "economic risk" embraces the idea of risk to future opportunities for savings or profit; the focus on the employer's well-being encompasses both the long-term and the short-term health of the business. *See Frost*, 125 F.3d at 369; *Lemire*, 720 F.2d at 1338. Whether the risk materializes or not is irrelevant; the point is that the employee has no right to endanger the employer's financial health or jeopardize the employer's long-term prospects through self-dealing. Therefore, so long as the employee could have reasonably foreseen the risk to which he was exposing the employer, the requirements of § 1346 will have been met. *But see Martin*, 228 F.3d at 17 n.22 (concluding that § 1346 is satisfied by a showing of actual harm to "tangible interests").

Thus, in analyzing the propriety of the district court's denial of Michael's motion for judgment of acquittal, we must assess whether there was sufficient evidence for the jury to find that Michael willingly aided and participated in the breach of a fiduciary duty by James, and that he could reasonably foresee that the breach would create an identifiable economic risk to Sonoco. The answer to both questions is in the affirmative. James testified at length about his duty of loyalty to Sonoco, including his contractual duty to disclose potential conflicts of interest.[8] James created the entity CSE which received

---

[8]As shown at trial, James had executed an employment agreement on June 16, 1986, in which he promised, inter alia, to "disclose in writing to the company any ideas which [he had] conceived or may have conceived . . . during the term of [his] employment with the company relating to any business or interests of the company, whether conceived or made during working hours or otherwise, and whether alone or jointly

over $12 million in revenues from Sonoco, yielding more than $2.8 million in profits, but he acknowledged at Michael's trial that he never disclosed his involvement with CSE to Sonoco and, in fact, that he had deliberately obscured it. James also testified that he had informed his brother, before incorporating CSE, that "if Sonoco ever found out about this, [he (James)] would get fired." J.A. 637. There was sufficient evidence for the jury to conclude that Michael was involved in, and willingly assisted in, his brother's fraud scheme to breach his duty of loyalty to Sonoco.

We also see the evidence as sufficient for the jury to conclude that the fraud scheme exposed Sonoco to a reasonably foreseeable economic risk. Regardless of whether the transactions between CSE and Sonoco were objectively fair, there is no doubt that Michael and James's deception deprived Sonoco of the chance to consider a variety of brokers and to search for the best possible price. Such conduct violates the honest services doctrine embodied in § 1346, in that it creates a clear risk that the employer will receive, in terms of price and quality of work, suboptimal service. *See deVegter*, 198 F.3d at 1331 (holding that corrupting process by which contracting was done constitutes reasonably foreseeable risk of economic harm because best service might not be obtained). Although James and Michael may have provided the optimal broker service to Sonoco, it is also possible that they did not, and the possibility of a suboptimal outcome was reasonably foreseeable to Michael and James at the time they defrauded Sonoco. As such, there was ample evidence for the jury to find that Michael knowingly assisted James's breach of his fiduciary duty, and that Michael should have reasonably foreseen that such a breach would expose Sonoco to an identifiable economic risk. We must therefore affirm the denial of Michael's motion for judgment of acquittal.

---

with others." J.A. 633. When questioned about how he understood his obligations to the company as a Sonoco employee, James acknowledged, "[E]verything I did belonged to Sonoco from that standpoint. My duties were to Sonoco." *Id.* at 632.

B.

1.

Michael also contends on appeal that two specific instances of prosecutorial misconduct denied him a fair trial. He first asserts that, in connection with his trial, the Government suppressed a three-page sentencing memorandum in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[9] This memorandum had been submitted to the court during James's sentencing hearing, and contained "numerous statements [by James] which were substantially different from the testimony [James] gave at [the] trial of Michael Vinyard." Appellant's Brief at 20. Michael and his lawyer both attended James's sentencing hearing, and they requested the production of other evidence concerning James's testimony from the prosecutor. Significantly, they made no request for the sentencing memorandum. At his sentencing hearing, Michael informed the district court that he had not received a copy of the sentencing memorandum, and he requested that a copy be placed into evidence. At that point, however, Michael made no assertion to the court either (1) that the Government had suppressed the memorandum or (2) that his failure to receive it earlier constituted a violation of his due process rights.

There are "[t]hree 'essential components' [to] a *Brady* violation . . . : (1) the evidence must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Under the circumstances here, it is unclear whether any error, much less a plain error, occurred. We need not specifically reach that issue, however, because Michael has failed to show that his lack of access to James's sentencing memorandum in any way altered the outcome of the district court proceedings. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (defining "affecting substantial rights" as "in most cases mean[ing] that the error must have been prejudicial: It must have affected the outcome of the district court proceedings").

---

[9]As we noted previously, *Brady* violations do not constitute prosecutorial misconduct per se. *See supra* note 3.

Although we could speculate that the memorandum might have enhanced Michael's efforts to impeach James's testimony, it is unlikely that it would have altered the trial's result; even with the memorandum, the jury would likely have credited James's trial testimony. Thus, Michael has failed to demonstrate plain error with respect to his *Brady* claim.

2.

Michael is also unable to demonstrate plain error in his claim that the Government solicited certain damaging testimony from two former employees of CSE, Bonnie Essary and Beverly Wells, after the Government had assured the district court and Michael's counsel that the witnesses would refrain from such testimony. Essary and Wells had worked in Michael's law office and each, for a time, had been assigned to work on CSE matters. Both women objected to working on CSE and were removed from CSE matters; Essary was reassigned and Wells was fired. Each received a payment from Michael, Essary as part of a Christmas bonus and Wells as severance pay, that appeared to be disproportionately large, and both women believed the payment to be "hush money" to prevent them from talking about CSE's activities. Michael moved in limine "for an Order directing the Government not to solicit speculative testimony" from these witnesses, but later withdrew the motion, apparently satisfied that the Government would not solicit such testimony. Wells then testified at trial that she believed that the severance payment made to her constituted "hush money" designed to ensure her silence on CSE matters, and Essary also testified that Wells had conveyed a similar belief to her at the time Wells was fired.

The trial testimony of Essary and Wells concerning "hush money" was only a small portion of their overall testimony on CSE, and was even a smaller portion of the Government's evidence against Michael. As such, Michael has failed to demonstrate that the admission of this evidence affected the outcome of his trial. Moreover, Michael is unable to demonstrate that the testimony in question was erroneously admitted. Ms. Wells's opinion or perception of what the abnormally large severance payment represented was entirely relevant, and it does not appear to have been inadmissible on other grounds. *See* Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness'

testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge."). As there was no objection to this evidence made at trial, any error was waived; regardless, we are unable to see its admission as error, plain or otherwise.

## C.

Michael also contends that his sentence violated the Sentencing Guidelines because the district court inappropriately applied the loss enhancement provisions of U.S.S.G. § 2F1.1(b)(1). Specifically, Michael asserts that the court used gain as a proxy for loss in calculating his sentence, and that such usage is barred in cases in which there was "no actual or intended loss to the victims." Appellant's Brief at 30 (quoting *United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir. 1995)). Michael posits that there was no loss, because Sonoco received the services for which it bargained in its dealings with CSE and turned a profit on its recycling venture, and therefore the enhancement of his sentence under the loss enhancement provisions was improper.

We must disagree with Michael's contentions concerning his sentence. Although he is correct that "gain . . . does not support a loss enhancement under § 2F1.1(b)(1) if there was no actual, probable, or intended loss to the victims," Michael misunderstands the meaning of "loss" in this context. *United States v. Marcus*, 82 F.3d 606, 608 (4th Cir. 1996). His argument is that "loss" under 2F1.1(b)(1) should be judged by whether the defrauded party suffered an absolute economic loss on the transaction; if the transaction was profitable, then loss enhancement provisions are not applied. However, the relevant question is not whether the victim lost money on the transaction, but whether the victim was deprived of assets or services it would have possessed absent the fraud. *See Marcus*, 82 F.3d at 608 ("A determination of the amount of loss suffered focuses, as it does in theft cases, on the value of the money, property, or services unlawfully taken.") (quoting U.S.S.G. § 2F1.1(b)(1), comment (n.7)). The issue of "loss" therefore turns on how much Sonoco paid for the broker services of

CSE versus how much it would have paid for those services absent Michael and James's fraud scheme. With respect to these determinations, we must accord deference to the district court, and we review its findings only for clear error. *See United States v. Colton*, 231 F.3d 890, 911 (4th Cir. 2000). In this instance, the district court found that if James had disclosed his capacity to handle the recycling operation, Sonoco would have quickly brought the vast majority of the services in-house. The court therefore concluded that the profit earned by CSE in its dealings with Sonoco constituted the excess amount Sonoco paid as a result of the fraud scheme. Such findings are not clearly erroneous, and we must reject Michael's contention on this point.

D.

Michael also challenges the schedule for restitution payments arranged by the district court. The court ordered Michael to pay $1,418,419.65 in restitution and, after finding that his net worth was $683,700, directed Michael to pay the outstanding balance at the rate of $5,000 per month, beginning thirty days after his release from prison. Although not disputing the magnitude of the restitution award, Michael contends that the court did not adequately consider his financial status and earning potential, as required by the MVRA, in structuring his restitution payments, and that it consequently created and imposed an unrealistic payment schedule.

In formulating the manner in which restitution is to be paid, the district court "is required [under MVRA] to consider: (1) the financial resources of the defendant . . . ; (2) projected earnings and other income of the defendant; and (3) any financial obligations of the defendant, including obligations to dependents." *United States v. Alalade*, 204 F.3d 536, 539 (4th Cir. 2000); *see also* 18 U.S.C. § 3664(f)(2). Although a restitution order that requires Michael to pay $60,000 a year in restitution may seem excessive for a sixty-two year old lawyer convicted of mail fraud, the court made substantial findings regarding Michael's assets and earning capacity. Moreover, the court's sentencing order specifically directed that it be kept continuously apprized of Michael's financial status, and the court reserved the right to modify the restitution payment schedule if Michael's status changed. Under these circumstances, the court's establishment of

the schedule for restitution payments was not an abuse of its discretion.

## E.

Michael also asserts that his trial counsel's performance was constitutionally ineffective. He bases this contention on multiple grounds: (1) his lawyer's failure to timely obtain James's sentencing memorandum; (2) the failure of counsel to secure the exclusion of the Wells/Essary testimony; and (3) the failure of his lawyer to object to the judge's "willful blindness" jury instruction.[10] Since Michael raises the ineffective assistance claim for the first time on direct appeal, we can address it only if it "conclusively appears" from the record "that his attorney did not provide effective assistance." *United States v. Martinez*, 136 F.3d 972, 979 (4th Cir. 1998); *see also United States v. Smith*, 62 F.3d 641, 651 (4th Cir. 1995). *But cf. United States v. Russell*, 221 F.3d 615, 619 (4th Cir. 2000) (addressing ineffective assistance claim on direct appeal subsequent to Rule 33 motion for new trial). It is by no means clear on this record that Michael's lawyer was constitutionally ineffective; indeed, none of the asserted "errors" appear to be sufficiently significant to meet the prejudice requirement of *Strickland*. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (holding that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). As such, Michael has failed to meet the standard mandated by *Martinez* and *Smith*, and we will not address the merits of his ineffective assistance of counsel claim. If Michael desires to have this claim adjudicated, he must raise it by way of a collateral challenge. *Smith*, 62 F.3d at 651.

---

[10]The Government requested that the district court instruct the jury that the knowledge requirement of a § 1341 mail fraud charge was met if the Government demonstrated that Michael deliberately disregarded or consciously avoided information concerning the true nature of CSE. The court accepted the Government's request, and it instructed the jury that the "government can also meet its burden of showing that a defendant had actual knowledge of falsity if it establishes beyond a reasonable doubt that he acted with deliberate disregard of the truth or with conscious purpose to avoid learning the truth." J.A. 1181.

## IV.

Pursuant to the foregoing, we find no reversible error in the under-lying proceedings, and we affirm Michael Vinyard's convictions and sentence.

*AFFIRMED*