**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4743**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EDWARD HUGH OKUN,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Robert E. Payne, Senior District Judge.  (3:08-cr-00132-REP-1)

Argued:  September 21, 2011          Decided:  November 17, 2011

Before NIEMEYER and KING, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Andrew Anthony Protogyrou, PROTOGYROU & RIGNEY, PLC, Norfolk, Virginia, for Appellant.  Michael Steven Dry, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.  **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, Jessica A. Brumberg, Richard D. Cooke, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Edward Hugh Okun operated a "Ponziesque" scheme, resulting in losses in excess of $125 million dollars. Following a jury trial, he was convicted on twenty-three counts arising from this scheme. He was sentenced to 1200 months' imprisonment, a sentence 3600 months below the advisory Guidelines sentence. Okun raises four issues on appeal: (1) whether the superseding indictment was legally sufficient; (2) whether the district court erred when it refused to grant an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978); (3) whether the district court erred when it denied his motion for continuance filed two weeks before trial; and (4) whether the district court abused its discretion in sentencing him. For the reasons stated below, we affirm.

## I. Background

In 2005, Okun was the sole owner of Investment Properties of America (IPofA), a Virginia limited liability company, with its principal place of business in Richmond, Virginia. IPofA was involved in the business of commercial real estate investment and management. In 2005, Okun formed 1031 Tax Group, a Delaware limited liability company with its principal place of business in Richmond.

In connection with 1031 Tax Group, Okun became involved in the business of operating qualified intermediary (QI) companies.[1] Between August 2005 and December 2006, Okun acquired six different QI companies, which in turn became subsidiaries of 1031 Tax Group.

After acquiring his first QI company, Atlantic Exchange Company (AEC), Okun began to wire AEC client funds to his personal bank account and IPofA's bank account, with the assistance of Lara Coleman, IPofA's Chief Operating Officer. During the conspiracy, Coleman continued to assist Okun in the

---

[1] Section 1031 of the Internal Revenue Code permits individuals (exchangers) to defer the payment of capital gains tax on the sale of certain assets when such assets are properly exchanged in a "like kind" exchange. 26 U.S.C. 1031. In general, a like-kind exchange occurs when one piece of property is sold and, within a given period of time, a similar piece of property is purchased. The like-kind exchange allows the exchanger to delay recognizing a gain on the sold property, as the tax basis of the sold property carries forward to the newly-acquired property. Thus, the recognition of a gain and the payment of capital gains tax are delayed. Id. § 1031(d). For the newly-acquired property to qualify as "like kind," it must be identified within forty-five days and be purchased within one hundred and eighty days of the sale of the sold property. Id. § 1031(a)(3). In addition, the exchanger must not receive the proceeds from the sale of the sold property, either actually or constructively, during the prescribed period. 26 C.F.R. § 1.1031(k)-1(a). A QI company can be used to hold the sale proceeds in the interim, preventing the exchanger's receipt of the funds. Id. § 1.1031(k)-1(g)(4). The Internal Revenue Code and regulations contain no requirement or restriction as to how the QI company is to hold the proceeds and, so far as the Internal Revenue Code is concerned, the QI company may invest the proceeds. Such investment typically is governed by the agreement between the exchanger and the QI company.

fraudulent scheme, which enabled Okun to use money held by the QI companies on behalf of the exchangers for personal use and for purposes related to IPofA's business. The uses of the funds held by the QI companies were not disclosed to the exchangers and were in violation of the agreements between the exchangers and the QI companies.

In 2007, Janet Dashiell, who had managed one of the QI companies acquired by Okun, began to work for 1031 Tax Group. Dashiell alerted the government to the manner in which the QI funds were being used by Okun and 1031 Tax Group.

In May 2007, 1031 Tax Group filed for bankruptcy. The collapse of 1031 Tax Group ultimately resulted in a loss in excess of $125 million dollars to exchangers who had deposited funds with the QI companies affiliated with 1031 Tax Group.

On March 17, 2008, a three-count indictment was filed in the United States District Court for the Eastern District of Virginia, charging Okun with the following offenses: one count of mail fraud, 18 U.S.C. § 1341; one count of bulk cash smuggling, 31 U.S.C. § 5332; and one count of making a false declaration, 18 U.S.C. § 1623(a).

On July 10, 2008, a twenty-seven count superseding indictment was filed in the district court. The superseding indictment charged Okun with the following offenses: one count of conspiracy to commit mail fraud and wire fraud, 18 U.S.C.

4

§§ 1341, 1343, and 1349, one count of conspiracy to commit money laundering, id. §§ 371 and 1956(h), thirteen counts of wire fraud, id. § 1343, three counts of mail fraud, id. § 1341; three counts of promotional money laundering, id. § 1956(a)(1)(A)(i), one count of concealment money laundering, id. § 1956(a)(1)(B)(i), three counts of money laundering, id. § 1957, one count of bulk cash smuggling, 31 U.S.C. § 5332, and one count of making a false declaration, 18 U.S.C. § 1623(a).

On February 27, 2009, the government filed a motion to dismiss one of the wire fraud and one of the mail fraud counts. On the same day, the district court granted the motion.

On March 3, 2009, the case proceeded to trial. After the government rested its case, Okun moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court granted the motion with respect to the two remaining mail fraud counts, but denied the motion as to the other counts. Following Okun's presentation of his defense, closing arguments, and the district court's instructions, the case went to the jury. The jury found Okun guilty as to the remaining twenty-three counts of the superseding indictment.

The district court sentenced Okun to 1200 months' imprisonment, a downward variance from the advisory Guidelines

sentence of 4800 months' imprisonment. Okun noted a timely appeal.

## II. Sufficiency of the Indictment

Okun first challenges the sufficiency of the indictment with respect to the mail fraud and wire fraud conspiracy count and the wire fraud counts. According to Okun, the indictment did not provide sufficient notice of the alleged misrepresentations made by Okun to complete the alleged frauds.

Whether an indictment properly charges an offense is a matter of law which we consider de novo if, as in this case, the defendant below makes a timely objection to the indictment. United States v. Darby, 37 F.3d 1059, 1062-63 (4th Cir. 1994). Because Okun timely objected below to the sufficiency of the indictment, we apply a heightened scrutiny. Id. at 1063. Under our case law, a "valid indictment must: (1) allege the essential facts constituting the offense; (2) allege each element of the offense, so that fair notice is provided; and (3) be sufficiently distinctive that a verdict will bar a second prosecution for the same offense." United States v. Bolden, 325 F.3d 471, 490 (4th Cir. 2003).

In this case, the mail fraud and wire fraud conspiracy count and the wire fraud counts tracked the statutory language of the relevant statutes and contained the essential elements of

6

both mail fraud and wire fraud, as well as conspiracy.  Cf.
United States v. Fogel, 901 F.2d 23, 25 (4th Cir. 1990) (noting
that an indictment that tracks the statutory language ordinarily
is valid).[2]  For example, the mail fraud and wire fraud
conspiracy count charges:

> From in or about August 2005 through in or about May
> 2007, within the Eastern District of Virginia and
> elsewhere, defendants [Edward Hugh Okun and Lara
> Coleman] did unlawfully, knowingly, and intentionally
> combine, conspire, confederate, and agree with each
> other and with others, both known and unknown, to
> commit offenses against the United States, to wit:
>
> a.  To devise and intend to devise a scheme and
> artifice to defraud and to obtain money and property
> by means of material false and fraudulent pretenses,
> representations, and promises, and knowingly transmit
> and cause to be transmitted by means of wire
> communications in interstate and foreign commerce, any
> writings, signs, signals, pictures, and sounds for the
> purpose of executing such scheme and artifice, in
> violation of Title 18, United States Code, Section
> 1343;
>
> b.  To devise and intend to devise a scheme and
> artifice to defraud and to obtain money and property
> by means of material false and fraudulent pretenses,
> representations, and promises, and knowingly: (a)
> placing and causing to be placed in any post office

---

[2] The elements of mail fraud are: (1) the existence of a scheme to defraud and (2) the use of mails to perpetrate that scheme.  United States v. Vinyard, 266 F.3d 320, 326 (4th Cir. 2001).  The elements of wire fraud are: (1) the existence of a scheme to defraud and (2) the use of wire communication in furtherance of that scheme.  United States v. Curry, 461 F.3d 452, 457 (4th Cir. 2006).  The elements of a mail fraud or wire fraud conspiracy are: (1) the existence of an agreement to commit mail or wire fraud, (2) willing participation by the defendant, and (3) an overt act in furtherance of the agreement. United States v. Edwards, 188 F.3d 230, 234 (4th Cir. 1999).

and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (b) depositing and causing to be deposited any matter and thing whatever to be sent and delivered by any private and interstate commercial carrier; and (c) causing to be delivered by mail and private and interstate commercial carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

(J.A. 69).

The language used to describe the mail fraud and wire fraud conspiracy count directly tracks both the mail and wire fraud statutes, but adds in both instances that the "false and fraudulent pretenses" were "material." (J.A. 69). The introductory charging language tracks 18 U.S.C. § 1349, which criminalizes any attempt or conspiracy to violate, among other statutes, the mail fraud and wire fraud statutes. Numerous overt acts in furtherance of the conspiracy are set forth in the lengthy manner and means section of the mail fraud and wire fraud conspiracy count. Thus, the essential elements for this count are clearly specified.

The same can be said about the wire fraud counts. Those counts charge that Okun and others

for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, did knowingly transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

8

(J.A. 83). This charging language is identical to § 1343, except that, like the language in the mail fraud and wire fraud conspiracy count, it adds the word "material" to describe the "false and fraudulent pretenses." (J.A. 83).

The mail fraud and wire fraud conspiracy count and the wire fraud counts also alleged the essential facts underlying each offense, allowing Okun to raise the defense of double jeopardy should the need arise in a successive prosecution. With respect to the mail fraud and wire fraud conspiracy count, the manner and means section of that count describes how Okun purchased QI companies, which used exchange agreements that required client exchange funds to be held for the purpose of funding client exchanges. Instead of abiding by the requirements set forth in the exchange agreements, Okun used the client exchange funds both to purchase other QI companies and for other purposes wholly unrelated to funding client exchanges.

The manner and means section of the mail fraud and wire fraud conspiracy count also describes how Okun and others hid from 1031 Tax Group clients the true and desperate financial condition of 1031 Tax Group by paying off earlier exchangers with the deposits of later exchangers. The count also describes how Okun and others lied to exchangers when the exchanges came due and how 1031 Tax Group was unable to fund the exchanges.

The manner and means section of the mail fraud and wire fraud conspiracy count also details how Okun and other conspirators concealed the theft of 1031 Tax Group client exchange funds from other executives both at IPofA and 1031 Tax Group. The count focuses on important aspects of Okun's scheme by highlighting three different sources of legal advice that Okun received in the late fall of 2006 regarding his misappropriation of 1031 Tax Group funds. The count also sets forth an approximate loss of $132 million dollars.

Like the mail fraud and wire fraud conspiracy count, the wire fraud counts also set forth the essential facts underlying each count. The superseding indictment provides a sufficient description of a scheme to defraud. The superseding indictment alleges that property had been misappropriated, the means by which Okun gained control over that property, and that he attempted to conceal material facts from the rightful owners of that property. Moreover, each count sets forth a date, an amount, and a description of the wire transaction.

In sum, the mail fraud and wire fraud conspiracy count sets forth the essential elements of the offense and the essential facts with more than sufficient specificity to put Okun and any future court on notice of the actions for which Okun was charged, and would allow Okun to properly raise a defense of double jeopardy in a future prosecution. The count included a

10

date range for the conduct charged, identified the relevant companies, detailed the manner and means of the scheme, and included an approximate amount of total loss. The wire fraud counts contained the same necessary specificity. Thus, Okun's challenge to the sufficiency of the indictment must be rejected. Cf. United States v. Loayza, 107 F.3d 257, 261 (4th Cir. 1997) ("The indictment here was sufficiently specific. The time period, the scheme, the purported investment companies, the 'cover-up' of the diversion of funds, and the use of the mail to carry out the scheme are all alleged.").

## III. Franks Evidentiary Hearing

On April 26, 2007, a search warrant was issued by a United States Magistrate Judge pursuant to a sworn affidavit filed by United States Postal Inspector John Barrett, Jr. Inspector Barrett's affidavit set forth information and beliefs concerning the illegal activities of Okun and his related corporate entities. The primary source of the information in the affidavit was Dashiell. The information from Dashiell was corroborated by evidence produced by a confidential informant (CI). At issue here is Paragraph 18 of the affidavit, which states:

> [Dashiell] has informed me that on a daily basis, 1031 Tax Group clients either close on substitute property, and so need their deposited funds, or decide not to

11

purchase new property and request that their deposits be returned. Because client funds have not been maintained in insured bank accounts, and have instead been used by the subjects for various investments and personal expenses, their funds are not available to be returned. Instead, for at least the last several weeks, 1031 Tax Group has been using the money deposited by new clients to re-pay other clients who need or are demanding their funds immediately. [Dashiell] has informed me that 1031 Tax Group has not had enough money over the past several weeks to pay several of their clients. In conversations between David Field and [Dashiell], recorded with the consent of [Dashiell], Field confirmed that 1031 Tax Group does not have sufficient funds to repay its clients. During one of those conversations, Field stated that Edward Okun was working on refinancing deals that would bring more money into the 1031 Tax Group companies, but that in the meantime, the companies should continue to bring in new clients so that their deposits can be used to pay the clients currently demanding their money.

(J.A. 747-48).

The search warrant authorized the searching agents to retrieve: (1) all communications between and among 1031 Tax Group clients and officers and employees of IPofA and its subsidiaries and related companies; (2) all documents and data regarding the movement of money between Okun and other Okun-related companies and third parties; (3) all bank records of Okun and other Okun-related companies; and (4) any retained copies of tax returns filed by Okun and other Okun-related companies.

On April 27, 2007, federal law enforcement agents undertook a thorough search of the offices of various corporate entities

12

associated with Okun and 1031 Tax Group. The product of that search was a large quantity of documentary evidence relating to Okun and his transactions with the various companies with which he was involved.

In the district court, Okun challenged the search on numerous grounds. On appeal, however, he presses only one claim. According to Okun, Paragraph 18 of Inspector Barrett's affidavit contained one material false statement, that is, that IPofA's Chief Financial Officer, David Field, "confirmed [with Dashiell] that 1031 Tax Group does not have sufficient funds to repay its clients." (J.A. 748). Okun posits the exact opposite is true—that Field "believed that sufficient assets were available to repay all investors." Appellant's Br. at 11.

The district court rejected this contention, concluding that Inspector Barrett's statement concerning Field's confirmation was not false. According to the district court, Inspector Barrett's statement was not false, because, in context, Inspector Barrett "is stating that he has been informed that 1031TG does not have the funds on hand to pay back those exchangers who are currently requesting the return of their funds, but that the corporation is investigating financing options that would allow for the exchangers to be paid." (J.A. 581). The district court noted that this reading of the affidavit was supported by other portions of the affidavit.

13

In general, a defendant is not entitled to challenge the veracity of a facially valid search warrant affidavit. United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011). In its decision in Franks, however, the Supreme Court carved out a narrow exception to this rule:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment . . . requires that a hearing be held at the defendant's request.

438 U.S. at 155-56. After making the essential preliminary showing, the defendant is entitled to an evidentiary hearing on the veracity of the statements in the affidavit. The purpose of a Franks evidentiary hearing is to determine whether the probable cause determination was based on intentionally false statements. United States v. Akinkoye, 185 F.3d 192, 199 (4th Cir. 1999). If, after a Franks evidentiary hearing, the defendant has shown by a preponderance of the evidence that false statements were knowingly and intentionally (or with reckless disregard for the truth) included in the search warrant affidavit, and that such false statements were necessary to establish probable cause, the evidence seized must be suppressed. Franks, 438 U.S. at 155–56.

14

In order for the Franks rule to apply and justify suppression, the defendant must satisfy both prongs of the rule. First, the defendant must show by a preponderance of the evidence that the affiant placed false statements in the affidavit, either knowingly and intentionally or with a reckless disregard for the truth. Id. at 156. Second, the defendant must show that, with the false statements purged from the affidavit, the remainder of the affidavit is insufficient to establish probable cause. Id. at 155–56. Thus, if an affidavit includes false statements knowingly and intentionally (or recklessly) made, the evidence seized in the resulting search will not be suppressed if the affidavit, purged of the false statements, is nonetheless sufficient to establish probable cause. See United States v. Friedemann, 210 F.3d 227, 229 (4th Cir. 2000) (requiring suppression only if false statements necessary to finding of probable cause).

Okun's Franks contention founders for the simple reason that Inspector Barrett's affidavit does not contain a false statement, as counsel for Okun candidly conceded at oral argument.[3] Inspector Barrett's affidavit states that he had been

_____

[3] In its brief, the government raises the issue of standing, contending that the mere fact that Okun owned the corporate entities whose premises were searched is insufficient to confer upon him Fourth Amendment standing. Because there were no false (Continued)

15

informed by Dashiell that 1031 Tax Group in "the past several weeks" did not have sufficient funds on hand to pay back "several" of its clients. (J.A. 748). This information, which Okun does not challenge, amply supports the veracity of Field's confirmation that there were insufficient funds to repay 1031 Tax Group's clients. The truth of Field's confirmation also is supported by the corroborative evidence that Okun was seeking financing to continue the fraud. In short, the district court did not err when it refused to order an evidentiary hearing pursuant to <u>Franks</u>.[4]

## IV. Denial of Motion for Continuance

We review the district court's denial of a motion for continuance for abuse of discretion. <u>United States v. Williams</u>, 445 F.3d 724, 739 (4th Cir. 2006). The district court abuses its discretion when its denial of a motion for continuance is "an unreasoning and arbitrary insistence upon expeditiousness in

statements in the affidavit at issue, we need not address the issue of standing.

[4] We also note that Okun's <u>Franks</u> argument fails because: (1) nothing in the record indicates that Inspector Barrett's alleged false statement was made with intentional or reckless disregard for its truth; and (2) even assuming that Okun is correct that Inspector Barrett intentionally included the alleged false statement in his affidavit, the remainder of the lengthy and thorough affidavit demonstrates probable cause.

16

the face of a justifiable request for delay." Id. (citation and internal quotation marks omitted).

In November 2008, Okun received a continuance of the trial until March 2, 2009. His January 16, 2009 request for a continuance was denied. Two weeks prior to trial, Okun again sought a continuance. This motion was premised on two theories. First, the government had provided a witness list in alphabetical order instead of listing the order in which it intended to call such witnesses. Second, Okun argued that he was uncertain as to whether the government would be permitted to proceed with a theory that Okun made misrepresentations to the prior owners of the QI companies he purchased, in addition to the clients of those QI companies.

The district court denied the motion though, in its order, the government was ordered to provide a list of witnesses in the order in which they would be called to testify. The district court found that Okun had adequate notice of the government's theory of the case and that a continuance would prejudice the government.

We find no abuse of discretion. The record reflects that the government discussed with Okun's counsel for many months its theory of misrepresentations to prior owners of the QI companies. Counsel for Okun was also on notice of such theory through a variety of district court filings and document

17

production.    Moreover, had a continuance been granted, the government would have suffered prejudice, as it had already arranged for over twenty-five witnesses to travel to Richmond from around the country.

## V. Sentence

We review a sentence imposed by the district court under the deferential abuse-of-discretion standard, regardless of whether the sentence imposed is inside, just outside, or significantly outside the Guidelines range.  United States v. Evans, 526 F.3d 155, 161 (4th Cir. 2008); see also Gall v. United States, 552 U.S. 38, 41 (2007).  The first step in this review requires us to inspect the record for procedural reasonableness by ensuring that the district court committed no significant procedural errors, such as failing to calculate or improperly calculating the Guidelines range, failing to consider the 18 U.S.C. § 3553(a) factors, or failing to adequately explain the sentence.  United States v. Boulware, 604 F.3d 832, 837–38 (4th Cir. 2010).

In explaining the selected sentence, the district court is not required to "robotically tick through § 3553(a)'s every subsection."  United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006).   Rather, the district court "must make an individualized assessment based on the facts presented," by

applying "the relevant § 3553(a) factors to the specific circumstances of the case before it." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009) (citation, internal quotation marks, and emphasis omitted). The district court must also state in open court the particular reasons supporting its chosen sentence and "set forth enough to satisfy" us that it has "considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." Rita v. United States, 551 U.S. 338, 356 (2007). "If, and only if, we find the sentence procedurally reasonable can we consider" its substantive reasonableness. Carter, 564 F.3d at 328 (citation and internal quotation marks omitted).

In this case, the sentence imposed is both procedurally and substantively reasonable. First, the district court properly calculated the applicable Guidelines range. Okun was convicted of one count of conspiracy to commit mail fraud and wire fraud, one count of conspiracy to commit money laundering, twelve counts of wire fraud, seven counts involving money laundering, one count of bulk cash smuggling, and one count of making a false declaration. The convictions were grouped together for sentencing purposes and produced a single offense level of 53, ten levels above the highest offense level on the Sentencing Table. A total offense level of more than 43 is to be treated as an offense level of 43. U.S. Sentencing Guidelines Manual

19

(USSG) Chapter 5, Part A Sentencing Table, comment. (n.2).

Okun's criminal history category was I. Under the Guidelines,

offense level 43, in criminal history category I, provides an

advisory Guidelines sentence of life imprisonment. Because none

of the counts of conviction carried a statutory maximum sentence

of life imprisonment, the district court applied USSG § 5G1.2,

which governs sentencing on multiple counts of conviction.[5] As

such, Okun's advisory Guidelines sentence was the statutory

maximum sentence on all counts of conviction combined—4,800

months.

Next, the district court considered the relevant § 3553(a)

factors, emphasizing the extensive harm caused by Okun's

conduct, and the need for adequate deterrence and to protect the

public from further crimes by Okun. The district court also

considered Okun's heart condition.

Okun's main challenge to his sentence is that the district

court did not consider his age and lack of criminal history in

---

[5] The statutory maximum sentences for the counts of conviction varied from five to twenty years. USSG § 5G1.2(d) states: "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law." USSG § 5G1.2(d).

imposing sentence. However, we have repeatedly emphasized that the district court is not required to apply § 3553(a) in a checklist fashion. Johnson, 445 F.3d at 345. Here, the district court made extensive findings supporting the imposition of a variance sentence 3600 months below the advisory Guidelines sentence. After reviewing those extensive findings, we are satisfied that the district court considered the parties' arguments and had a reasoned basis for exercising its own legal decisionmaking authority. Rita, 551 U.S. at 356. Accordingly, we reject Okun's challenge to his sentence.[6]

## VI. Conclusion

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

---

[6] Okun also complains that his sentence exceeded the length of sentence typically imposed in similar cases. Under 18 U.S.C. § 3553(a), one relevant sentencing factor is the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). We note the sentence imposed in this case is in line with sentences imposed in similar white-collar cases. See, e.g., United States v. Lewis, 594 F.3d 1270, 1278 (10th Cir.) (affirming 310-year sentence for a defendant convicted by a jury of an investment fraud of over $40 million dollars), cert. denied, 130 S. Ct. 3441 (2010).

21