**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricardo U. ALERRE, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**Deborah Bordeaux, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**Michael D. Jackson, Defendant–Appellant.**

**Nos. 03–4207, 03–4212, 04–4161.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 20, 2005.

Decided Dec. 1, 2005.

---

**ARGUED:** Eli D. Stutsman, Portland, Oregon, for Appellants. Thomas Ernest Booth, United States Department Of Justice, Washington, D.C., for Appellee. **ON BRIEF:** G. Wells Dickson, Jr., Charleston, South Carolina, for Appellant Deborah Bordeaux; Lionel S. Lofton, Charleston, South Carolina, for Appellant Ricardo U. Alerre; David Bruce Betts, Columbia, South Carolina, for Appellant Michael D. Jackson. Jonathan S. Gasser, Acting United States Attorney, William E. Day, II, Assistant United States Attorney, Office of the United States Attorney, Columbia, South Carolina, for Appellee.

Before MICHAEL, MOTZ, and KING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge KING wrote the opinion, in which Judge MICHAEL and Judge MOTZ joined.

KING, Circuit Judge.

Appellants Ricardo U. Alerre, Deborah S. Bordeaux, and Michael D. Jackson (the "defendants") challenge the various convictions and sentences imposed on them in the District of South Carolina. The defendants—medical doctors—seek a new trial on drug distribution, drug conspiracy, and money-laundering conspiracy charges lev-

ied against them by the grand jury. The multiple charges in their indictment arise from an alleged prescription-selling operation and a health-care-fraud scheme carried out during a four-year period in the Myrtle Beach area of South Carolina. The defendants contend on appeal that, in their 2003 trial, their lawyers were constitutionally ineffective and the prosecutors engaged in prejudicial misconduct. They also maintain that the trial evidence was insufficient to support their money-laundering conspiracy convictions. Finally, the defendants challenge their sentences on the basis of the Supreme Court's recent decision in *United States v. Booker*, and the prosecutors have confessed error on that point. As explained below, we affirm the defendants' convictions, vacate their sentences, and remand for resentencing.

## I.

The Government prosecuted the defendants—who were medical doctors licensed in South Carolina and registered with the Drug Enforcement Administration (the "DEA")—for their involvement with the Comprehensive Care and Pain Management Center ("CCPMC"), in Myrtle Beach. During the relevant period (1997 to 2001), CCPMC was owned and operated by Dr. David Woodward. On August 29, 2002, the grand jury charged the defendants, along with Woodward and four others, in a ninety-three count indictment. J.A. 83–110.[1] The defendants were each charged with conspiracy to distribute controlled substances, in contravention of 21 U.S.C. § 846 (the "drug conspiracy

charge") (Count 1); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (the "laundering conspiracy charge") (Count 93); and multiple counts of distributing controlled substances, in violation of 21 U.S.C. § 841(a)(1) (the "distribution charges"). More specifically, of the forty-two distribution charges in the indictment, Dr. Jackson was charged with five counts of distributing OxyContin, Oxy IR, and Percocet (Counts 9 through 13); Dr. Bordeaux with four counts of distributing OxyContin and Oxy IR (Counts 30 through 33); and Dr. Alerre with eight counts of distributing OxyContin (Counts 34 through 41).[2]

## A.

The defendants' jury trial was conducted in Florence, South Carolina, from January 27 to February 10, 2003. The jury heard the testimony of fifty-four witnesses, thirty of whom were called by the Government. The most important prosecution witness was Dr. Woodward, who had earlier pleaded guilty under a plea agreement and was cooperating with the United States Attorney.

According to Dr. Woodward's testimony, CCPMC was simply a front for an illegal prescription-selling operation and a health-care-fraud scheme. Woodward explained how he had developed a plan to conceal CCPMC's illegal activities from the law enforcement and medical authorities. In carrying out his activities, he had directed CCPMC physicians to conduct superficial physical examinations of CCPMC patients

---

1. Our citations to "J.A. ——" refer to the contents of the Joint Appendix filed by the parties in these appeals.

2. OxyContin, Oxy IR, and Percocet are brand names for drugs containing oxycodone, a Schedule II controlled substance. *See* 21 C.F.R. § 1308.12(b)(1)(15). Schedule II controlled substances have three defining charac-

teristics: (A) "a high potential for abuse"; (B) "a currently accepted medical use in treatment ... or a currently accepted medical use with severe restrictions"; and (C) a possibility that abuse "may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2).

that served no medical purpose and were intended only to make the issuance of prescriptions look like the practice of medicine. Tr. 790.[3] In so doing, Dr. Woodward developed a medical record template with boilerplate diagnoses that could be loaded into patients' charts and used to deceive insurance companies and investigators. Tr. 792. Patients were given various diagnostic tests to justify insurance billings, and CCPMC physicians systematically requested outside radiologists to "over read" magnetic resonance imaging pictures in order to justify specific prescriptions. Tr. 798–99. If a patient was insured, the CCPMC doctors would order additional unnecessary tests and scans. Tr. 799.[4] The revenue from such tests and scans constituted about half of CCPMC's income, with the other half being derived from the superficial patient examinations and the issuance of illegitimate prescriptions. *Id.*

In his testimony, Dr. Woodward acknowledged that fifteen to twenty percent of CCPMC's patients had legitimate medical problems, but asserted that all patients were "treated the same"—i.e., "[t]hey all received the narcotic medication"—without regard to medical necessity. Tr. 887. The testimony of former CCPMC employees and patients corroborated Woodward's evidence.

Dr. Woodward hired Dr. Jackson in February 1998, and hired Dr. Bordeaux two years later, in February 2000. The evidence revealed that Bordeaux and Jackson, along with other CCPMC physicians, developed a practice known as "fast tracking," which they used to expedite the issuance of illegitimate prescriptions for controlled substances. Tr. 399–400. Under the fast-tracking practice, a CCPMC physician would enter an examination room where five or six patients waited, sign prescriptions for each, and promptly exit without asking any medical questions or performing any medical examinations. *Id.*

After Drs. Bordeaux and Jackson left CCPMC in the summer of 2000, Dr. Woodward hired Dr. Alerre. According to Woodward, he needed Alerre to "shadow" him and issue prescriptions because Woodward's license to prescribe controlled substances had been suspended by the DEA. Tr. 818. Woodward further testified that Alerre understood his role before he accepted a position with CCPMC. *Id.* When Alerre began his work at CCPMC, he would accompany Woodward while superficial patient examinations were conducted. Tr. 819. At the conclusion of such examinations, Alerre would issue illegitimate prescriptions to the patients. Tr. 820.

Donald Shafer, a former CCPMC patient, testified that, on his first visit to CCPMC, Drs. Alerre and Woodward took him to an examination room, searched him to determine if he was wired, and asked if he was working as an undercover agent. J.A. 581–82. Once satisfied that Shafer was not working for the authorities, Woodward and Alerre asked Shafer if he wanted a prescription for OxyContin or a drug called Lorcet. J.A. 584.

Importantly, Dr. Woodward also testified that he confronted each defendant and inquired whether they understood the illicit nature of CCPMC's activities. The de-

---

**3.** Because the Joint Appendix does not contain portions of the trial record relied upon by the Government, we refer to the pertinent parts of the trial transcript, omitted from the Joint Appendix, as "Tr. ——."

**4.** The indictment did not charge the defendants with any substantive offenses related to health care fraud. One of the three unlawful activities specified in the laundering conspiracy charge, however, included the submission of false claims to health care benefit programs, in contravention of 18 U.S.C. § 1347.

fendants assured Woodward that they were willing to participate in CCPMC's overall scheme. Woodward approached Dr. Jackson, asked if he was "able to do this," and Jackson assured him "I got your back." Tr. 792. In answering a similar inquiry, Dr. Bordeaux replied "if I go along with this and do this, can I have your father's pickup truck?" Tr. 815. When Woodward asked Dr. Alerre if he was comfortable with "what we were doing," Alerre paused and responded "[o]h, to hell with it." Tr. 823. Woodward understood Alerre's response to confirm that Alerre was "part of our team"; that is, Alerre was agreeing to join in Woodward's illicit operations. *Id.*

### B.

The prosecution's expert witness, Dr. Arthur Jordan, testified that the defendants systematically wrote prescriptions that "were not issued for a legitimate medical purpose." J.A. 819. Based on his review of eighty-eight randomly selected patient charts, Jordan opined that the defendants had failed to adhere to generally accepted medical standards. *See* J.A. 757, 789–813. Specifically, Jordan testified that many of the prescriptions lacked appropriate documentation or had no "follow up" treatment, that the defendants ignored "red flags" indicative of drug abuse, and that certain prescriptions and dosages were inappropriate. *See* J.A. 789–813.

Dr. Jordan then testified that the defendants had issued prescriptions that were "totally away from and inconsistent with the dosages that a prudent physician in the state of South Carolina would give, as what we call the standard of care." J.A. 815. When the court, *sua sponte*, expressed concern that such evidence might be improper, a defense lawyer stated that he was waiting for Jordan to finish his answer. J.A. 816. The court then ob-

served there was "no reason to put something in the record which the jury may [consider] ... that is not the standard." *Id.* The court concluded, in the presence of the jury, that "[w]hether the doctors are negligen[t] or not, whether they were guilty of malpractice, is not an issue in this case." *Id.*

The prosecution presented other evidence that the defendants' prescription practices constituted "illegitimate medicine," and that their practices consistently failed to meet the ordinary "standard of care." Though the defense lawyers did not object to such evidence, the court expressed its concern that standard-of-care evidence might be irrelevant and confusing, in that it appeared to relate to civil negligence issues and not necessarily to whether the defendants had contravened the applicable criminal statutes. The prosecutors, as well as the defense lawyers, repeatedly assured the court that such evidence was relevant and appropriate.

After the prosecution rested its case-in-chief, the defendants presented their own evidence. Dr. Alerre testified personally and called eight other witnesses to testify. Alerre asserted that he had only prescribed medicine to patients he believed to be in pain, and he denied having agreed to participate in CCPMC's illegal activities. Dr. Jackson testified that he had always prescribed medicine in good faith, and he called a corroborating witness. Dr. Bordeaux did not testify, but called thirteen witnesses of her own.

At the close of trial, the court instructed the jury without objection. The instructions included the elements of the various offenses charged, the legal propriety of a physician's actions concerning prescriptions, and the availability of a good faith defense on the distribution and drug conspiracy charges. Tr. 2393; J.A. 1297–99.

In particular, the court instructed the jury that it could not convict on the distribution and drug conspiracy charges if it found only that the defendants' practices fell "below that line of what a reasonable physician would have done." J.A. 1299.[5] The instructions were that, in order to convict on the distribution and drug conspiracy charges, the jury was obliged to find beyond a reasonable doubt that the defendants were selling drugs, or conspiring to do so, and not practicing medicine. *Id.* By its verdict, the jury found each defendant guilty as charged, except that Dr. Alerre was found not guilty on one distribution charge (Count 37) and the Government dismissed a distribution charge against Dr. Bordeaux (Count 33).

## C.

The laundering conspiracy charge alleged that the defendants conspired with Dr. Woodward and others "to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate and foreign commerce with the intent to promote the carrying on of specific

unlawful activities." J.A. 103. It further alleged that in excess of $5,000,000 was received through CCPMC's health-care-fraud scheme (i.e., ordering unnecessary tests to collect insurance) and its prescription-selling operation, and that such monies were deposited into accounts held and controlled by Woodward and his companies. J.A. 103–04. It alleged that these monies were expended to continue CCPMC's health-care-fraud scheme and prescription-selling operation, and that, "[i]n furtherance of the conspiracy, and to achieve the objectives thereof," payments were made from the illicitly obtained funds, held by Woodward and his companies, to the defendants, Woodward, other CCPMC employees, and other institutions. J.A. 101–06.[6] At trial, the parties stipulated that "the checks drawn on the business accounts of [Woodward and his companies], which are referred to in [the laundering conspiracy charge], were cashed, and were financial transactions affecting interstate commerce." J.A. 672–a to 673. As explained above, Woodward's testimony was that each of the defendants

5. More specifically, on the standard of care issue, the instructions provided by the trial court were as follows:

There has been some mention ... of the standard of care. I'm not so sure the word[ ] malpractice ha[s] not been used. Those words relate to civil actions. When you see a doctor, as a patient, that doctor must treat you in a way so as to meet the standard of care that physicians of similar training would have given you under the same or similar circumstances....

That's not what we're talking about. We're not talking about these physicians acting better or worse than other physicians. We're talking about whether or not these physicians prescribed a controlled substance outside the bounds of their professional medical practice. J.A. 1299.

6. More specifically, the laundering conspiracy charge, a violation of 18 U.S.C. § 1956(h), alleged in part:

From about June 1997, and continuing until ... July 2001 ... [the defendants and others] did ... knowingly ... conspire ... to knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate ... commerce with the intent to promote the carrying on of specific unlawful activities, that is: causing controlled substances to be dispensed outside the usual course of medical practice and for other than legitimate medical purposes, in violation of [21 U.S.C. § 841]; to defraud health care benefits programs by submitting false claims, in violation of [18 U.S.C. § 1347]; and laundering money with the intent to promote the carrying on of these unlawful activities, in violation of [18 U.S.C. § 1956(a)(1)(A)(i)].

J.A. 103. In its paragraphs 3 and 4, the laundering conspiracy charge identified more than eighty transactions as specific overt acts that were performed in furtherance thereof. *See* J.A. 101–06.

had knowingly agreed to participate in CCPMC's illegal activities relating to illegitimate prescriptions and health care fraud.

At the close of the prosecution's case-in-chief, and again at the conclusion of the evidence, the defendants each moved under Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal on the laundering conspiracy charge. J.A. 982–84; Tr. 2256–57.[7] Their Rule 29 motions were denied and the jury found each of them guilty on that charge.

### D.

On February 17, 2004, prior to the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the defendants' sentencing hearings were conducted and their sentences were imposed. On appeal, the Government concedes that—because the challenged sentences were premised on drug quantities neither found by the jury nor admitted by the defendants, and because the sentences were imposed under a mandatory Sentencing Guidelines regime—the defendants are entitled to be resentenced. *See Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621; *United States v. Hughes*, 401 F.3d 540, 555–56 (4th Cir.2005) (concluding error was plain and warranted reversal where court imposed sentence under mandatory Guidelines based on judicial factfinding, increasing sentencing range beyond that which could have been imposed on the basis of facts found by jury or admitted by defendant).

The defendants have filed timely notices of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291. Their consolidated appeals present three issues:

- First, whether a civil liability standard was erroneously injected into the trial by the prosecutors and the defense lawyers, and, if so, whether the defendants are entitled to relief from their convictions either because their lawyers were constitutionally ineffective, or because the prosecutors engaged in prejudicial prosecutorial misconduct;
- Second, whether the evidence was sufficient to support their convictions on the laundering conspiracy charge; and
- Third, whether the defendants—as the prosecution concedes—are entitled to resentencing because *Booker* was contravened.

As explained below, we reject the defendants' challenges to their convictions, but we vacate their sentences and remand.

### II.

### A.

First, the defendants contend that they are entitled to a new trial because their lawyers were constitutionally ineffective and because the prosecutors engaged in prejudicial prosecutorial misconduct. These claims derive from their assertion that the lawyers on both sides of the case erroneously and unconstitutionally misunderstood and misapplied the pertinent standard for criminal liability.

### 1.

We may consider an ineffective assistance claim in the first instance on direct appeal only if it conclusively appears from the record that counsel was constitutionally ineffective. *United States v. Vinyard*, 266 F.3d 320, 333 (4th Cir.2001); *see*

---

**7.** The defendants moved at trial for judgment of acquittal on all counts, but on appeal assert only that they were entitled to such an acquittal on the laundering conspiracy charge.

*also United States v. Russell*, 221 F.3d 615, 619 (4th Cir.2000) ("A defendant . . . may raise an ineffective assistance claim in the first instance on direct appeal only where the ineffectiveness 'conclusively appears' from the record."). In order to show such ineffectiveness, a defendant is obliged to demonstrate that (1) the performance of his lawyers "was deficient in that it fell below an objective standard of reasonableness and outside the wide range of professionally competent assistance," and (2) he was actually prejudiced "in that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Swisher v. True*, 325 F.3d 225, 232 (4th Cir.2003) (internal quotation marks omitted); *accord Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

 When asserting a prosecutorial misconduct claim, a defendant bears the burden of showing (1) that the prosecutors engaged in improper conduct, and (2) that such conduct prejudiced the defendant's substantial rights so as to deny the defendant a fair trial. *See United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir.1993). And we review for plain error a prosecutorial misconduct claim that was not raised or presented to the trial court. Fed. R.Crim.P. 52(b); *see also Vinyard*, 266 F.3d at 324 (applying plain error review to prosecutorial misconduct claim first raised on appeal). In reviewing for plain error, we must affirm unless an appellant can show that (1) an error was made, (2) it was plain, and (3) it affected the appellant's substantial rights. *Vinyard*, 266 F.3d at 324. Moreover, the correction of plain error lies within our discretion, which we do not exercise "unless the error seriously

affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 324–25 (alteration and internal quotation marks omitted).

### 2.

### a.

In order to resolve the ineffective assistance and prosecutorial misconduct claims raised here, we must first assess the proper relationship between the civil and criminal standards of liability for a physician who has prescribed drugs. The distribution charges against the defendants involve violations of 21 U.S.C. § 841(a)(1), while the drug conspiracy charge involves a violation of 21 U.S.C. § 846, having as its object the contravention of § 841(a)(1).[8] In relevant part, § 841(a)(1) provides that "[e]xcept as authorized by [law], it shall be unlawful for any person [to] knowingly or intentionally . . . distribute . . . a controlled substance." Generally, in order to convict under § 841(a)(1), the prosecution is obliged to prove "that (1)[the] defendant knowingly or intentionally distributed the controlled substance alleged in the indictment, and (2) at the time of such distribution the defendant knew that the substance distributed was a controlled substance under the law." *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir.1994). An enhanced analysis applies, however, to persons who are properly registered with the DEA. Pursuant to 21 U.S.C. § 822, such persons—including doctors—are authorized to distribute controlled substances to the extent authorized by their registrations. *See* § 822(a) (requiring persons who distribute controlled substances to

---

8. Section 846 of Title 21 provides, in pertinent part, that "[a]ny person who . . . conspires to commit any offense defined in this subchapter shall be subject to the same penal-ties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy."

obtain annual registration from Attorney General); § 822(b) (authorizing registrant to distribute controlled substances "to the extent authorized by the[ ] registration and in conformity with ... other provisions of [law]"); 28 C.F.R. § 0.100 (delegating, inter alia, Attorney General's authority under § 822 to DEA Administrator).

■■■ The seminal decision explaining the liability of such registered distributors is *United States v. Moore*, where the Supreme Court held that a DEA registration under § 822 grants only "a qualified authorization of certain activities, [and] not a blanket authorization" to dispense controlled substances. *See* 423 U.S. 122, 131, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975). The defendants in *Moore*—physicians who, although registered with the DEA pursuant to § 822, were convicted under § 841(a)(1) for illegally distributing controlled substances—contended on appeal that, as § 822 registrants, they were immune from liability under § 841. The Court disagreed, affirming their drug distribution convictions and holding "that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice." *Id.* at 124, 96 S.Ct. 335 (the "criminal standard"). In discussing the proper application of the criminal standard, we have observed that "a licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution and is no different than a large-scale pusher." *Tran Trong Cuong*, 18 F.3d at 1137 (internal quotation marks omitted). In contrast to the criminal standard, a medical malpractice plaintiff in South Carolina must show in a civil case (1) "the generally recognized practices and procedures that would be exercised by competent practitioners in a defendant doctor's field of medicine under the same or similar circumstances," and (2) "that the defendant doctor departed from the recognized and generally accepted standards, practices, and procedures." *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 487 S.E.2d 596, 599 (1997) (the "civil standard").

In our 1994 *Tran Trong Cuong* decision, we spelled out the proper relationship between the criminal standard, on the one hand, and the civil standard, on the other. Tran, a registered physician, had been convicted on several distribution charges under § 841(a)(1). *See Tran Trong Cuong*, 18 F.3d at 1133. He sought relief from his convictions by, inter alia, contending that the prosecution's evidence was insufficient. *Id.* at 1137. As part of his contention, Tran asserted that the trial court had, in conducting his trial, mistakenly and erroneously applied the civil standard instead of the criminal standard. *Id.*

We responded to Tran's appeal by explaining the pertinent distinctions between the criminal standard and the civil standard. In particular, Judge Chapman's opinion observed that a criminal prosecution requires "proof beyond a reasonable doubt that the doctor was acting outside the bounds of professional medical practice." *Tran Trong Cuong*, 18 F.3d at 1137. It elaborated that, in such a situation, a physician's authority to prescribe drugs is being used "not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, i.e. the personal profit of the physician." *Id.* We concluded that the instructions in Tran's trial not only comported with the criminal standard, but also required the prosecution to prove that the physician had written prescriptions "without a legitimate medical purpose," arguably a more stringent requirement than the criminal standard an-

nounced in *Moore*, inuring "to [the] defendant's benefit." *Id.* at 1137–38.

■ Importantly, as Judge Chapman explained in *Tran Trong Cuong*, we found sufficient evidence to sustain Tran's distribution convictions by relying in part on expert testimony that Tran had deviated drastically from accepted medical standards. *Id.* at 1138–40. As *Tran Trong Cuong* thus demonstrates, evidence that a physician's performance has consistently departed from accepted professional standards supports the proposition that the physician was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice. As a result, such evidence may properly be relevant to establish that the physician contravened the criminal standard of liability. *See id.*

b.

■ The defendants contend that the lawyers on both sides of this case erroneously conflated the criminal standard with the civil standard and that, as a result, they were tried and convicted for civil malpractice rather than for the criminal distribution of drugs. Importantly, however, the defendants have neither challenged the sufficiency of the trial evidence nor the propriety of the jury instructions of the

trial court.[9] Indeed, the defendants do not point to any specific trial error that prejudiced them. Rather, they contend that their entire trial was infected with an erroneous standard of proof and that the verdict must thus be set aside, notwithstanding the sufficiency of the evidence and the propriety of the jury instructions. As explained below, this position does not pass muster.

First, the defendants have not directed us to any evidence that was improperly introduced. In contending that they were erroneously tried, the defendants appear to be asserting that, because standard-of-care evidence might show that a physician contravened the civil standard, it must categorically be excluded from a criminal proceeding. As our analysis in *Tran Trong Cuong* demonstrates, however, evidence that a physician consistently failed to follow generally recognized procedures tends to show that in prescribing drugs he was not acting as a healer but as a seller of wares. *See* 18 F.3d at 1138–40; *see also* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence ... more probable or less probable than it would be without the evidence."); Fed.R.Evid. 402 (providing that relevant evidence is generally admissible).[10]

9. The instructions in this case are only distinguishable from those we approved in *Tran Trong Cuong* in that the trial court here more clearly articulated the distinction between the civil standard and the criminal standard. *See Tran Trong Cuong*, 18 F.3d at 1137–38. In addition to reciting the *Tran Trong Cuong* instructions nearly verbatim, the court cautioned the jury about the standard-of-care evidence, J.A. 1299, and explained the degree of proof (i.e., proof beyond a reasonable doubt) necessary for a criminal conviction, Tr. 2390. The court further instructed the jury that "[i]f you find that a defendant acted in good faith in dispensing the drugs charged ..., then you must find that defendant not guilty." J.A.

1298. The court then addressed the standard-of-care evidence and instructed the jury that the critical issue on the distribution and drug conspiracy charges was not whether the defendants had acted negligently, but "whether or not these physicians prescribed a controlled substance outside the bounds of their professional medical practice." J.A. 1299.

10. To be sure, an undue emphasis on standard-of-care evidence might, in certain circumstances, confuse a jury. *See* Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

■ Second, as the defendants concede, the jury was correctly instructed on the applicable legal principles. The trial court was careful to spell out the differences between the criminal standard and the civil standard. Indeed, it admonished the jury that the defendants could only be convicted under the criminal standard, and it emphasized that they could not be convicted if they had dispensed the controlled substances at issue "in good faith." Ordinarily, of course, we presume that a properly instructed jury has acted in a manner consistent with the instructions. *See Jones v. United States*, 527 U.S. 373, 394, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). Nonetheless, the defendants maintain that, on this record, an overwhelming probability exists that the jury ignored the instructions and convicted the defendants of civil malpractice. *See Goldsmith v. Witkowski*, 981 F.2d 697, 703 (4th Cir.1992) ("The presumption of cure by a court's instructions is overcome when there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the [trial error] would be devastating to the defendant." (internal quotation marks omitted)). In these circumstances, we are unable to agree with the defendants. The jury entered its deliberations armed with ample admissible evidence and with proper instructions on the applicable legal principles. The defendants' assertions that their lawyers were confused at trial is insufficient to rebut the presumption that the jury used these tools properly.[11]

In these circumstances, the defendants have not established any trial error caused by a misapprehension of the criminal standard on the part of the lawyers. They are unable to show that a substandard performance by their lawyers conclusively appears from the record, and they have also failed to demonstrate that the prosecutors engaged in any improper conduct relating to the standard of proof or their use of evidence. Accordingly, we decline to reach and address the defendants' ineffective assistance claims, and we reject their prosecutorial misconduct claims on the merits.

### B.

Next, the defendants contend that the evidence was insufficient to support their convictions on the laundering conspiracy charge and that the district court therefore erred in denying their motions, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for judgment of acquittal on that charge. The defendants' contention on this point is premised on their view that, as a matter of law, a defendant must have committed the substantive offense of promotion money laundering in order to be convicted on the laundering conspiracy charge. As explained below, that proposition is legally incorrect. Moreover, the jury was properly instructed—without objection—on the laundering conspiracy charge, and the defendants' convictions on that offense are supported by substantial evidence.[12]

---

confusion of the issues, or misleading the jury....").

**11.** Even if the defendants could show error with respect to their standard-of-proof assertions, it would be difficult to conclude that they were thereby prejudiced. Indeed, Dr. Woodward's testimony alone was sufficient to convict the defendants, and it was supported by other evidence. And in light of its verdict,

we assume that the jury credited Woodward's testimony. *See United States v. Hughes*, 401 F.3d 540, 544-45 (4th Cir.2005).

**12.** The defendants also maintain on appeal that, as a predicate to convicting them on the laundering conspiracy charge, the jury was obliged to find that they had contravened the criminal standard in prescribing controlled substances. In so doing, they reassert their

### 1.

█ We review de novo a district court's denial of a Rule 29 motion for judgment of acquittal. *United States v. Ryan–Webster,* 353 F.3d 353, 359 (4th Cir. 2003).[13] In so doing, we are obliged to sustain a guilty verdict if, viewing the evidence in the light most favorable to the Government, it is supported by "substantial evidence." *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996) (en banc) (citing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). We have defined "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* Moreover, in conducting such a review, we must "remain cognizant ... that the jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *Id.* (internal quotation marks omitted).

### 2.

The laundering conspiracy charge is, in substance, that the defendants contravened 18 U.S.C. § 1956(h) by conspiring with Dr. Woodward and others to commit promotion money laundering, as defined in 18 U.S.C. § 1956(a)(1)(A)(i). By its terms, the promotion money laundering provision—the violation of which was the object of the laundering conspiracy charge—requires the prosecution to (1) trace the money at issue to an underlying unlawful activity, and (2) prove that the money was transferred in order to promote a specified unlawful activity. *See* § 1956(a)(1)(A)(i).[14] In previously addressing a pro motion money laundering issue, we found the promotion element satisfied when a defendant paid his subordinate employee for being involved in an unlawful scheme, because such payments compensated the employee for his illegal activities and encouraged his continued participation. *United States v. Bolden,* 325 F.3d 471, 489 (4th Cir.2003).

█ Pursuant to § 1956(h), the laundering conspiracy statute, "[a]ny person who conspires to commit any offense defined in [§ 1956] ... shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." Thus, in order for the jury to convict on the laundering conspiracy charge, the prosecution was obliged to prove that (1) a conspiracy to commit promotion money laundering was in existence, and (2) that during the conspiracy, the defendant knew that the pro-

---

ineffective assistance and prosecutorial misconduct claims in attacking their convictions on the laundering conspiracy charge. As explained above, *see supra* Part II.A, we are unable to grant relief on either of those claims, and we thus need not address whether they might have entitled the defendants to relief on the laundering conspiracy charge.

**13.** Pursuant to Rule 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A Rule 29 determination thus focuses on both the elements of the offense charged and on the factual sufficiency of the evidence.

**14.** The offense of promotion money laundering stands in contrast to the offense of "concealment money laundering," as defined and prohibited by § 1956(a)(1)(B)(i). While both offenses require the prosecution to trace the funds at issue to a specified unlawful activity, a defendant commits promotion money laundering by transferring the funds "to promote the carrying on of specified unlawful activity," *see* § 1956(a)(1)(A)(i), whereas concealment money laundering is committed by transferring such funds "to conceal or disguise" their illegal origins, *see* § 1956(a)(1)(B)(i).

ceeds used to further CCPMC's illicit operations had been derived from an illegal activity, and knowingly joined in the conspiracy. *See United States v. Diamond,* 378 F.3d 720, 727 (7th Cir.2004) ("To convict a defendant of conspiracy to commit money laundering, the government must show the defendant was involved with two or more people to launder money and that the defendant knew the proceeds used to further the scheme were derived from an illegal activity."). As explained below, substantial evidence supports each of these elements, and the district court properly denied the defendants' requests for judgments of acquittal on the laundering conspiracy charge.

### a.

■ First, the defendants challenge their convictions on the laundering conspiracy charge by contending that the evidence was insufficient to find them guilty of promotion money laundering. This contention misses the point: As a factual matter, the defendants were neither charged with nor convicted of promotion money laundering. Rather, they were charged with and convicted of *conspiring* to commit promotion money laundering. As a legal matter, the prosecution was not required to prove that the defendants had committed promotion money laundering in order to convict them of conspiring to do so. *See Diamond,* 378 F.3d at 727. Accordingly, we need not—and do not—reach the issue of whether the evidence in this case would have supported their convictions on the substantive offense of promotion money laundering. *Cf. United States v. Heaps,* 39 F.3d 479, 486 (4th Cir.1994) (concluding that simple drug transaction did not constitute promotion money laundering where no evidence showed that proceeds from transaction were subsequently used to promote unlawful activity), *recognized as abrogated on other grounds by United States v. Villarini,* 238 F.3d 530, 534–35 (4th Cir.2001). Our inquiry is thus limited to whether the trial evidence was sufficient to sustain the defendants' convictions for conspiracy to commit promotion money laundering.

### b.

Second, the defendants have not assigned error to the court's instructions on the laundering conspiracy charge, and they interposed no objection to those instructions at trial. The court instructed the jury that, in order to convict on that charge, it was obliged to find beyond a reasonable doubt as to each defendant: (1) that the conspiracy alleged existed; (2) that "at some time during the ... life of the conspiracy ... the defendant knew the purpose of the agreement and then deliberately joined the conspiracy"; and (3) that "[a]t some point during the ... life of the conspiracy ... one of its alleged members knowingly performed one of the overt acts charged in order to further or advance the purpose of the conspiracy." Tr. 2413. The court also explained to the jury the essential elements of the offense of promotion money laundering, which was the object of the laundering conspiracy charge. Tr. 2413–15.

Not only have the defendants failed to assign error to the instructions, the trial court arguably added an unnecessary element to the § 1956(h) offense, favoring the defendants. The court instructed the jury that it could not convict on the laundering conspiracy charge without finding that a conspirator had committed an overt act in furtherance of the conspiracy. *Compare* Tr. 2413 (instructing on overt act requirement for § 1956(h)) *with Whitfield v. United States,* 543 U.S. 209, 125 S.Ct. 687, 691, 160 L.Ed.2d 611 (2005) (holding that § 1956(h) has no overt act element), *and Bolden,* 325 F.3d at 491 (same). In sum,

there were no objections to the relevant instructions, and the only possible error in those instructions was to the benefit of the defendants.[15]

### c.

 Finally, there was substantial evidence presented to the jury supporting the defendants' convictions on the laundering conspiracy charge. According to Dr. Woodward's evidence, the defendants agreed to participate with him and others in carrying on CCPMC's unlawful operations (the prescription-selling and health-care-fraud schemes). The conspiracy the defendants joined called for Woodward and his companies to acquire funds through CCPMC's illegal activities and then distribute those funds to CCPMC's physicians, employees, and owners (including the defendants), as compensation for their efforts; that is, the scheme called for Woodward to commit promotion money laundering. *Cf. Bolden*, 325 F.3d at 489 (concluding that promotion money laundering conviction was supported by evidence that defendant paid subordinate for participation in illegal scheme because such payment compensated subordinate for past illegal activities and encouraged his future participation).[16] Unfortunately for the de-

fendants, they cannot, as a legal proposition, divorce themselves from the reasonably foreseeable acts which Woodward committed in furtherance of the conspiracy while they were members thereof. *See United States v. Newsome*, 322 F.3d 328, 338 (4th Cir.2003) ("[U]nder conspiracy law, [a conspirator] is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable.") (citing *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

Dr. Woodward's evidence, if credited by the jury, thus established the essential elements, as spelled out in the instructions, for conviction of the defendants on the laundering conspiracy charge: (1) that there was a conspiracy to commit promotion money laundering; (2) that during the life of the conspiracy, each defendant knew the purpose thereof and then deliberately joined in it; and (3) that during the conspiracy, a conspirator performed at least one of the overt acts alleged in furtherance thereof. Crediting Woodward's testimony, as we must, the convictions on the laundering conspiracy charge are supported by substantial evidence.

---

**15.** Although not an issue on appeal, the instructions on the unlawful activity aspect of the object of the laundering conspiracy charge varied from the indictment. As explained above, the object of the conspiracy in that charge was promotion money laundering. The laundering conspiracy charge identified three specific unlawful activities that the conspiracy sought to promote: (1) the unlawful distribution of controlled substances (21 U.S.C. § 841); (2) health care fraud (18 U.S.C. § 1347); and (3) promotion money laundering (18 U.S.C. § 1956(a)(1)(A)(i)). J.A. 103. The court instructed, however, that the "specified unlawful activity is the *conspiracy* to distribute or dispense controlled substances." Tr. 2416 (emphasis added). There was no objection to this instruction, perhaps because the defendants believed it to be ad-

vantageous to them. In any event, it would plainly appear to be a nonfatal variance. *See United States v. Davis*, 202 F.3d 212, 216 n. 3 (4th Cir.2000) ("[A] nonprejudicial variance between the indictment and the proof that does not modify the elements of the charged offense *is no basis to invalidate a conviction.*").

**16.** In their Reply Brief, the defendants concede that the *Bolden* principles "might support a promotion [money laundering] claim against Dr. Woodward," but nonetheless contend that it cannot "support[ ] a promotion [money laundering] claim against Drs. Alerre, Bordeaux, and Jackson." Reply Br. at 15. As related above, this contention is beside the point.

## C.

■ In their third and final appellate contention, the defendants maintain they are entitled to resentencing under *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and its progeny. In its brief, in its supplemental letter of April 15, 2005 to this Court, and again at oral argument, the prosecution has conceded error on this issue and agreed that *Booker* mandates resentencing of the defendants. The prosecution's position is valid, and we therefore vacate the defendants' sentences and remand for such resentencing proceedings as may be appropriate.[17]

## III.

Pursuant to the foregoing, we affirm the defendants' convictions, vacate their sentences, and remand.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

**17.** As in *United States v. Hughes*, "[w]e of course offer no criticism of the district judge, who followed the law and procedure in effect at the time of [the defendants'] sentencing." *See* 401 F.3d 540, 545 n. 4 (4th Cir.2005).