**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-5136**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES WILBUR FONDREN, JR.,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:09-cr-00263-CMH-1)

Argued:  December 9, 2010          Decided:  March 18, 2011

Before GREGORY and SHEDD, Circuit Judges, and David A. FABER, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by unpublished opinion.  Senior Judge Faber wrote the opinion, in which Judge Gregory and Judge Shedd joined.

**ARGUED:** Lawrence Robbins, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, D.C., for Appellant. James Philip Gillis, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** William P. Baude, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER, LLP, Washington, D.C., for Appellant.  Neil H. MacBride, United States Attorney, W. Neil Hammerstrom, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

FABER, Senior District Judge:

Appellant James Wilbur Fondren, Jr. was convicted of unlawful communication of classified information by a government employee, in violation of 50 U.S.C. § 783(a), and two counts of making false statements to agents of the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. § 1001. He appeals his conviction on two grounds. First, he contends there was insufficient evidence to support his conviction for passing classified information because there was no evidence that he knew or had reason to believe the person to whom he communicated the information was a representative or agent of a foreign government. Fondren also contends that there was insufficient evidence to support his conviction on the false statement counts because the government failed to prove the materiality of the false statements. Finding Fondren's claims to be without merit, we affirm.

I.

Viewed in the light most favorable to the government, the evidence at trial established the following. In May of 1996, Fondren retired from active duty as a Lieutenant Colonel in the United States Air Force. In 1997 or 1998, Fondren started working as a "National Security Policy Consultant." JA630, 851. His first and only client was Tai Shen Kuo, a businessman with

ties to Fondren's hometown of Houma, Louisiana. Fondren first met Kuo in the early 1990s while in Houma visiting his family for the holidays.

In addition to owning and operating a restaurant in Houma, Kuo had a variety of business interests, including selling cotton, linter, and automobiles to the People's Republic of China (PRC or China). Kuo also performed consulting work in China for several companies. In the course of his business dealings in China, Kuo came to know an individual named Lin Hong, a PRC government official.

After a time, Lin began to cultivate Kuo as a source of information in the United States. Upon learning of Kuo's association with Fondren, Lin asked Kuo to get Fondren to write "opinion papers" on various topics selected by Lin. JA153-154, 158. Kuo concealed Lin's true affiliation with the PRC from Fondren, instead telling Fondren that Lin worked at an "academic institution in Hong Kong" and was doing research on North America. JA153. According to Kuo, he believed that Fondren would be more willing to help if Fondren thought that he was providing information to someone in Hong Kong, rather than China. Kuo did, however, tell Fondren that Lin was well connected to the Chinese government and would pass along Fondren's ideas to the "Beijing central government." JA154. Lin also used Fondren to get documents he wanted and, according

4

to Kuo, the more confidential or sensitive the document appeared to be, the more Fondren was paid.

In 1999, Fondren traveled to China with Kuo, a trip that was funded by Lin. Fondren met Lin during this trip although he remained in the dark regarding Lin's true identity. After Fondren's trip to China, Lin would sometimes email Fondren directly with his requests for information instead of using Kuo as an intermediary.

In August 2001, Fondren returned to government service and began working in a civilian capacity at the Pentagon. JA197, 390-91. There, he served as the Deputy Director of the Pacific Command's[1] Washington Liaison Office. JA391, 855. As the Deputy Director, Fondren was given a Top Secret security clearance like the one he had when on active duty with the Air Force. JA855.

Once Fondren returned to the Pentagon, he no longer had direct contact with Lin, but he did not give up his consulting arrangement with Kuo. JA197-98. He continued to provide Kuo with "opinion papers" and documents. Prior to beginning his job at the Pentagon, Fondren was paid by check and he reported the income on his tax return. Afterwards, however, Kuo paid him in

---

[1] The Pacific Command, otherwise known as PACOM, is comprised of U.S. armed forces covering the Asia-Pacific region. It is based in Hawaii, but has a liaison office in the Pentagon. JA391.

cash only and he no longer reported the income to the Internal Revenue Service.

After Fondren started his Pentagon job in August 2001, Kuo, acting at Lin's direction, sought to mislead Fondren into believing that Kuo was now collecting information at the direction of a Taiwanese general. They assumed that Fondren would be more willing to provide sensitive information if he believed that it was going to Taiwan rather than to the PRC. JA197-02. On March 4, 2007, the FBI recorded a conversation between Fondren and Kuo where Fondren acknowledged these requests for information from Kuo's "friend in Taiwan, the General." JA959.

By Kuo's own admission, there was no agreement between Fondren and Kuo that Fondren would provide Kuo with classified information. JA227. In fact, in order to slowly cultivate Fondren, Kuo actually told him, on occasion, that he did not want classified information. JA227-28. Of course, Kuo hoped that Fondren would, eventually, provide him with classified information. Id.

On August 10, 2007, FBI agents conducted a ruse interview of Fondren in an effort to evaluate the nature of his relationship with Kuo. JA308-315. Fondren was initially told that his assistance was being sought in connection with a

"sensitive national security matter" pertaining to the Pacific Command. JA309. During the interview, Fondren brought up Kuo's name and told the agents all about Kuo and his business contacts in Taiwan and China, but he never told them that he was writing papers for Kuo or that he was providing Kuo with Defense Department publications and documents. JA312-14.

At the outset of the interview, the FBI advised Fondren that the nature of the interview was "sensitive" and "confidential" and that it was "a national security matter." JA314. He was asked "not to discuss it outside of the room." Id. Two days after the FBI interview, however, Fondren sent Kuo an email in which he told Kuo of the "strange visit . . . by two FBI guys who said that they were from Counter Intelligence." JA962. Fondren told Kuo what he had said to them about Kuo. "The agents only wrote down only [sic] that information and didn't take notes when I talked about Vietnam and other Southeast Asia countries. . . . The discussion seemed to be in a bizarre direction, so I wanted you to be aware of my surprise visit in case you get a surprise also!" Id.

On September 22, 2007, Kuo telephoned Fondren and asked him to write more papers, including one on the topic of bilateral meetings between PACOM and China. JA963-66. On October 29, 2007, Fondren accessed a classified PACOM report, see Gov. Ex. 101, and cut and pasted classified information from it

7

concerning the agenda for the meeting.  Fondren then emailed the classified passages to himself on his classified work computer and incorporated this information, which was classified CONFIDENTIAL, into an opinion paper that he wrote and emailed to Kuo from his home on November 3, 2007.  Gov. Exs. 102-1, 102-3; JA204-205, 350-51.  It was this particular opinion paper that was the basis of Count Five of the superseding indictment – the one espionage count of which Fondren was convicted at trial.

On February 11, 2008, FBI agents arrested Kuo in Fondren's Annandale, Virginia residence, where he was staying as a guest. JA444.  A search of Fondren's home computer uncovered a number of past email communications with Kuo and Lin.  JA451-58.  The agents also discovered Kuo in possession of a draft document entitled "The National Military Strategy of the United States of America 2008, Version 5," which Fondren had given him. JA209-11, 476-77, 977.  It was marked "Pre-Decisional Working Document – DDS&P Close Hold."  JA978.  The document had been emailed to Fondren's work computer by a colleague at the Pentagon.  JA979-80.

On the same day Kuo was arrested, Fondren was interviewed by FBI agents at his workplace in the Pentagon.  JA444-45. Fondren made a number of false statements pertaining to his involvement in providing Kuo with classified information. Fondren falsely told the agents that everything he had written

8

for Kuo in his opinion papers had been based on information from press and media reports and from his experience and that he was sure he had never included any classified information in any of the papers he had written for Kuo. JA463-64. This was the charge in Count Six.

Fondren also falsely told the agents that he had not given Kuo a draft copy of the National Military Strategy of the United States, the document that the FBI had earlier found in Kuo's possession when he was arrested in Fondren's house. JA477. This was the charge in Count Eight.

In May 2008, in the United States District Court for the Eastern District of Virginia, Kuo pled guilty to conspiracy to communicate national defense information to a foreign government (the PRC), in violation of 18 U.S.C. § 794 (a) & (c).[2] JA136-37; see also Judgment in a Criminal Case, 1:08cr00179. He was subsequently sentenced to a term of imprisonment of 188 months. Id.

II.

On August 27, 2009, a federal grand jury in Alexandria, Virginia returned an eight-count superseding indictment charging Fondren with conspiracy to act as an unregistered agent of a

---

[2] The conspiracy charge to which Kuo pleaded guilty did not involve Fondren. JA136.

9

foreign government (18 U.S.C. § 951) and to commit honest services wire fraud (18 U.S.C. §§ 1343 & 1346), in violation of 18 U.S.C. § 371 (Count One); aiding and abetting an agent of a foreign government, in violation of 18 U.S.C. §§ 951 and 2 (Count Two); unlawful communication of classified information by a government employee, in violation of 50 U.S.C. § 783(a) (Counts Three through Five); and false statements to agents of the FBI, in violation of 18 U.S.C. § 1001 (Counts Six through Eight).

A jury trial began on September 21, 2009. At the conclusion of the government's case, the court granted the defendant's motion for judgment of acquittal with respect to Counts One and Two of the superseding indictment but denied the motion as to the other counts. The court also denied defendant's renewed motion and sent the remaining counts to the jury. On September 25, 2009, the jury returned its verdict finding Fondren guilty on Counts Five, Six and Eight. The jury acquitted Fondren on Counts Three, Four, and Seven. On January 22, 2010, the district court departed from the advisory guidelines range of 63 to 78 months and sentenced Fondren to a term of imprisonment of 36 months, to be followed by two years of supervised release.

III.

This court reviews the denial of a Rule 29 motion de novo. United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005), cert. denied, 547 U.S. 1113 (2006). In reviewing the sufficiency of the evidence following a conviction, the court is to construe the evidence in the light most favorable to the government, assuming its credibility, and drawing all favorable inferences from it, and will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); United States v. Lomax, 293 F.3d 701, 705 (4th Cir.), cert. denied, 513 U.S. 1135 (2002). "If there is substantial evidence to support the verdict, after viewing all of the evidence and the inferences therefrom in the light most favorable to the Government," the court must affirm. United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994), cert. denied, 513 U.S. 1135 (1995). Furthermore, this court "cannot make [its] own credibility determinations but must assume that the jury resolved all contradictions in testimony in favor of the Government." United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1402 (4th Cir. 1993).

11

IV.

Fondren contends that his conviction on Count Five must be set aside because there was insufficient evidence to show that Fondren knew the person to whom he was communicating classified information was an agent or representative of any foreign government. In order to establish the offense proscribed by 50 U.S.C. § 783(a),[3] the Government had to prove each of the following elements beyond a reasonable doubt: 1) that Fondren was an officer or employee of the United States or some department or agency thereof; 2) that the information he knowingly communicated was classified within the meaning of the statute; 3) that Fondren knew or had reason to believe the

---

[3] Section 783(a) of Title 50 of the United States Code provides, in part, that:

> It shall be unlawful for any officer or employee of the United States or of any department or agency thereof, . . . to communicate in any manner or by any means, to any other person whom such officer or employee knows or has reason to believe to be an agent or representative of any foreign government, any information of a kind which shall have been classified by the President (or by the head of any such department, agency, or corporation with the approval of the President) as affecting the security of the United States, knowing or having reason to know that such information has been so classified, unless such officer or employee shall have been specifically authorized by the President, or by the head of the department, agency, or corporation by which this officer or employee is employed, to make such disclosure of such information.

12

person to whom the information was communicated was an agent or representative of a foreign government; and 4) that Fondren knew or had reason to know that the information communicated had been classified as affecting the security of the United States. It is the third element on which Fondren contends there was a failure of proof.

The term "agent or representative of a foreign government" means an individual who operates subject to the direction or control of a foreign government or official. There is no requirement that a defendant know the identity of the particular foreign government on whose behalf the agent or representative to whom the defendant communicated classified information was acting. The government need only prove that a defendant knew or had reason to believe that the person to whom he communicated classified information was an agent or representative of any foreign government.

According to defendant, there was no evidence that he communicated information to someone he knew or had reason to believe was an agent or representative of a foreign government. Defendant argues that there was absolutely no evidence that he knew or had reason to believe that Kuo was an agent or representative of a foreign government and that any finding that he was is precluded by the district court's acquittal on Counts One and Two of the superseding indictment. As to the

13

government's theory regarding the Taiwanese general, defendant argues that this argument fails because there was no communication with such a person.

As to Count Five, the evidence at trial showed that Fondren accessed a classified computer system and copied classified information from a PACOM End of Day Update. Gov. Ex. 101; JA 350-51. He then inserted this classified information into an opinion paper that he emailed to Kuo. JA204-05, 350-51, 967; Gov. Ex. 102-3. Furthermore, the evidence is abundant that Fondren knew or had reason to believe that Kuo would pass the information along to the Taiwanese general. JA643-45, 949, 955-57, 959-60. Instead, Kuo gave the opinion paper containing the classified information to Lin, a government official for the People's Republic of China. JA204-05.

The evidence in the record shows that, once he started working at the Pentagon, Fondren was giving information to Kuo and he thought Kuo was passing it along to a Taiwanese general. JA643-45, 949, 955-57, 959-60. Because the Taiwanese general did not exist, Fondren argues that he cannot be convicted of espionage based upon the Taiwanese general being the "person" within the meaning of the statute because he did not "communicate" classified information to this "person." However, as the jury was instructed, there is no requirement that the government prove the defendant knew the identity of a

14

particular foreign government on whose behalf the agent or representative to whom the defendant communicated classified information was acting. The government need only prove that the defendant knew or had reason to believe that the person to whom he communicated classified information was an agent or representative of <u>any</u> foreign government.

In this case, the Taiwanese general was really a cover for Lin, the person who ultimately received the information. Kuo was the "manner" or "means" by which the information was communicated. So, contrary to Fondren's assertion, a "person" did receive the information. Furthermore, while it is arguable that Fondren was deceived about the identity of the person to whom the information was being conveyed and the foreign government on whose behalf he was working, i.e., Lin and the PRC, the evidence is abundant that Fondren was aware that he was passing classified information to an agent or representative of a foreign government. Deception, lies, and false identities are the hallmarks of espionage and Fondren cannot shield himself from liability by arguing that he was misled as to the particulars of the foreign government. The statute does not carve out such an exception. As Fondren himself acknowledged in an email to Lin: "The U.S. must not forget that international spying is commonplace . . . in fact, every nation spys [sic] on every other nation. If the U.S. wants to keep secrets safe,

15

then it must be more vigilant in its security procedures to safeguard knowledge from international theft." JA877 (Gov. Ex. 32).

There is also evidence to support a theory that Kuo, acting as the agent or representative of the Taiwanese general, was the "person" to whom the classified information was communicated. However, according to Fondren, when the district court granted its motion for judgment of acquittal as to Counts One and Two, it made a finding that "there just simply isn't any evidence, other than some bit of communication toward the end of the conspiracy, that would have given any inclination that Kuo was a representative of a foreign power." JA540. According to Fondren, that "finding" actually and necessarily decided that Kuo was not a foreign agent or government. Fondren is wrong.

A thorough reading of the record shows that the district court's ruling on defendant's motion for judgment of acquittal was not as sweeping as Fondren would have this court believe. Fondren's acquittal on those counts is not inconsistent with a conviction on Count Five. The wrongdoing charged in Counts One and Two allegedly spanned from 1997 through February 2008 whereas the crime charged in Count Five occurred in November 2007. In addition, the court specifically qualified its ruling by saying "other than some bit of communication toward the end of the conspiracy." Furthermore, the district court, who was in

16

the best position to understand the scope and basis of its ruling, specifically denied Fondren's motion for judgment of acquittal on the espionage counts, finding that there was sufficient evidence for those counts to go to the jury.

For all these reasons, this court concludes there was sufficient evidence for the jury to have concluded that Fondren knew the person to whom he was communicating classified information was an agent or representative of a foreign government.

V.

Fondren also challenges his conviction on Counts Six and Eight of the superseding indictment, both of which charged him with making false statements to the FBI, in violation of 18 U.S.C. § 1001.[4]

> To prove a violation of § 1001, the Government must establish that "(1) the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false, (2) the defendant acted `knowingly or willfully,' and (3) the false statement or concealed fact was material to a matter within the jurisdiction of the agency."

---

[4] That statute provides that "whoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully . . . makes any materially false . . . statement or representation [shall be guilty of an offense]." 18 U.S.C. § 1001(a)(2).

17

United States v. Ismail, 97 F.3d 50, 60 (4th Cir. 1996) (quoting United States v. Arch Trading Co., 987 F.2d 1087, 1095 (4th Cir. 1993) (citation omitted)).

According to defendant, the government failed to carry its burden with respect to the third element in that it failed to prove that Fondren's statements to the FBI were material. Specifically, defendant contends "the government presented no evidence of any influence that the statements could have had on the investigation, and therefore failed to prove materiality." Brief of Appellant at 32-33. This court disagrees.

The materiality inquiry focuses on whether the false statement had a "natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." Kungys v. United States, 485 U.S. 759, 770 (1988) (internal quotations and citations omitted). If a statement has a natural tendency to influence or is capable of influencing a decision or action, "[i]t is irrelevant whether the false statement actually influenced or affected the decision making process of the agency or fact finding body." United States v. Sarihifard, 155 F.3d 301, 307 (4th Cir. 1998).

According to the Supreme Court:

Deciding whether a statement is "material" requires the determination of at least two subsidiary questions of purely historical fact: (a) "what statement was made?" and (b) "what decision was the agency trying to

18

> make?" The ultimate question: (c) "whether the statement was material to the decision," requires applying the legal standard of materiality (quoted above) to these historical facts.

United States v. Gaudin, 515 U.S. 506, 512 (1995); see also United States v. Finn, 375 F.3d 1033, 1038 (10th Cir. 2004). Under this framework, it is clear that the evidence presented by the government in this case was sufficient for the jury to reasonably conclude that Fondren's false statements were material.

Special Agent Robert Gibbs with the FBI served as the case agent for the investigation and testified at Fondren's trial. JA443. Special Agent Gibbs testified that the FBI had started investigating Fondren in November 2005 and that, as the case agent, he was "the lead investigator on the case responsible for all aspects of the case, administrative, operational." JA443-44. Gibbs also participated in the FBI's investigation of Kuo. JA444.

Special Agent Gibbs testified that he and Special Agent Paula Paulk conducted the interview of Fondren on February 11, 2008. JA444-45. The agents initiated the interview by informing Fondren that, just that morning, Kuo had been arrested and charged with espionage. JA446-47. Fondren was not informed that he was suspected of any criminal activity. JA447. Indeed, according to Gibbs:

19

> We wanted Mr. Fondren to think that the investigation was solely focused on Mr. Kuo. We actually told him, because as he knew, Mr. Kuo had contacts all over the country, that we had actually dispatched agents truthfully nationwide to speak to Mr. Kuo's contacts. We had been given the task of talking to Mr. Fondren to determine what the nature of his relationship was with Mr. Kuo.

Id.

During the interview, the FBI questioned Fondren regarding Lin Hong. JA449-59. Fondren voiced his suspicions that Lin might be a member of the People's Liberation Army. JA459. As to the opinion papers, Fondren told the investigators that Kuo would tell him "someone in Taiwan . . . wanted to know about a certain topic, and then in response to that, [ ] Fondren would write an opinion paper." JA460. Agent Gibbs testified that, when asked whether he ever included classified information in any of those opinion papers, Fondren stated he never provided classified information. JA463-64. Fondren also denied having given Kuo a copy of "The National Military Strategy of the United States of America 2008, Version 5." JA476-77. However, when Kuo was arrested in Fondren's home, the document was found in Kuo's room. Id.

The interview of Fondren continued on the next day, February 12, 2008. On that day, the FBI informed Fondren that they had reason to believe Lin was actually associated with the PRC government and that Kuo had been providing all the

20

information he received from Fondren to Lin. JA489. According to Gibbs, Fondren responded that "his intuition must have been correct, that Mr. Lin was most likely PLA, People's Liberation Army, and most likely in an intelligence branch or foreign ministry." Id.

As to the "what statement was made?" inquiry under Gaudin, the evidence showed that Fondren made the following false statements: (1) that he had never included classified information in any of the papers he wrote for Kuo (Count 6); and (2) that he had not given a draft copy of "The National Military Strategy of the United States of America 2008, Version 5" to Kuo (Count 8). The evidence was also sufficient to allow the jury to determine what "decision" the FBI was trying to make, that is, it was in the midst of an investigation regarding the criminal activity of both Kuo and Fondren. Furthermore, an application of the legal standard of materiality to those facts leads to the reasonable conclusion that the false statements had the natural tendency to influence or were capable of influencing the FBI's investigation. A rational trier of fact could easily conclude that false statements, given during the course of an espionage investigation, concerning the source or nature of materials given to an alleged spy had a "natural tendency" to influence the investigation or was "capable" of doing so.

21

Fondren's contention that this court's decision in United States v. Ismail, 97 F.3d 50, 60 (4th Cir. 1996), compels the opposite conclusion is without merit. In Ismail, this court reversed a conviction under § 1001, finding that the government had failed to prove the materiality of the false statement. See id. at 60-61. In that case, the defendant had provided a false name and social security number on a bank signature card. The government, however, by its own admission, offered no evidence (or argument for that matter) regarding how a false name and social security number on a bank signature card had a natural tendency to influence or was capable of influencing the FDIC. See id. at 61. This case is distinguishable from Ismail in that there is ample circumstantial evidence from which the jury could have inferred the materiality of the false statements.

We also reject Fondren's argument that the statements were not material because the FBI investigators already knew the answers to the questions they asked him. "It is well established law in this Circuit that a finding of materiality is not dependent upon whether the fact finder was actually influenced by a defendant's false statements." United States v. Sarihifard, 155 F.3d 301, 307 (4th Cir. 1998); see also United States v. Turner, 551 F.3d 657, 664 (7th Cir. 2008) (holding that defendant's "statements to the FBI probably had very little actual influence on the agents because there were already in

22

possession of incriminating [information]" . . . but, because "statements were aimed at misdirecting the agents, . . . [it was] enough to satisfy the materiality requirement of § 1001") (emphasis in original); United States v. White, 270 F.3d 356, 365 (6th Cir. 2001) ("If the false statements are received by an agency, they may be material even if the receiving agent or agency knows that they are false."); United States v. Foxworth, 2009 WL 1582923, *3 (2d Cir. June 8, 2009) ("That the FBI knew that the statements were false when they were made is irrelevant to their materiality.") (unpublished).

The Supreme Court has confirmed that the test for materiality does not turn on whether the false statements were believed by the party to whom they were made.

> Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very purpose of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function. It could be argued, perhaps, that a disbelieved falsehood does not pervert an investigation. But making the existence of this crime turn upon the credulousness of the federal investigator (or the persuasiveness of the liar) would be exceedingly strange. . . .

Brogan v. United States, 522 U.S. 398, 402 (1998) (emphasis in original).

Likewise, Fondren's argument that the statements could not be material given that the investigation was essentially complete when the statements were made misses the mark. The

23

statements need only be <u>capable of influencing</u> the FBI; it is not necessary that they actually influenced the agency in this particular case. <u>See</u> <u>United States v. McBane</u>, 433 F.3d 344, 350-52 (3d Cir. 2005) (rejecting defendant's arguments that false statements to FBI investigators were not material within the meaning of 18 U.S.C. § 1001 because investigation was complete when statements were made).

Finally, to the extent Fondren argues that his conviction under 18 U.S.C. § 1001 should be set aside because he corrected his false statements the day after they were made, that argument is without merit. "There is no safe harbor for recantation or correction of a prior false statement that violates section 1001." <u>United States v. Stewart</u>, 433 F.3d 273, 318 (2d Cir. 2006); <u>see also</u> <u>United States v. Beaver</u>, 515 F.3d 730, 742 (7th Cir. 2008); <u>United States v. Sebaggala</u>, 256 F.3d 59, 64 (1st Cir. 2001); <u>United States v. Meuli</u>, 8 F.3d 1481, 1486-87 (10th Cir. 1993); <u>United States v. Salas-Camacho</u>, 859 F.2d 788, 791-92 (9th Cir. 1988); <u>United States v. Fern</u>, 696 F.2d 1269, 1275 (11th Cir. 1983).

## VI.

For the foregoing reasons, we affirm Fondren's convictions.

<u>AFFIRMED</u>

24